**\*NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

VICTOR RODRIGUEZ,       :
      :
      Plaintiff,       :       Civil Action No.: 12-4722 (FLW)
      :
v.       :       **OPINION**
      :
THE CITY OF NEW BRUNSWICK,       :
*et al.,*       :
      :
      Defendants.       :
_____:

### <u>WOLFSON, District Judge:</u>

Defendant Police Officer Christopher Bornheimer[1] ("Defendant" or "Officer Bornheimer") appeals the Magistrate Judge's Order, dated April 7, 2017, barring Defendant's expert, Dr. George Herlitz, from testifying at trial and striking the doctor's report. Plaintiff Victor Rodriquez ("Plaintiff") opposes the appeal. For the reasons set forth below, Defendant's appeal is **DENIED**. The Magistrate Judge's decision is hereby **AFFIRMED**. More specifically, the Magistrate Judge's decision to disqualify Dr. Herlitz as an expert and to strike Dr. Herlitz's report is affirmed, and that Defendant is precluded from obtaining a new expert at this late stage of litigation.

### BACKGROUND

The Court will only recount facts necessary to resolve the instant appeal. Plaintiff brought this excessive-force action against Defendant for permanent

_____

[1] The only remaining defendant is Officer Bornheimer. All other named defendants have been voluntarily dismissed by Plaintiff.

injuries he sustained as a result of a gunshot wound allegedly fired by Defendant. Plaintiff alleges that he was an innocent victim involved in a gang-related incident, wherein members of a gang attempted to rob Plaintiff on the streets of New Brunswick, New Jersey. Plaintiff further alleges that at the time the incident occurred, Officer Bornheimer and other officers observed the alleged assault, however, they did not intervene. Fearing for his life, Plaintiff avers that he ran toward an adjacent corner to retrieve a blank gun from a backpack, and that he fired two blank rounds into the air in an effort to fend off the gang members. According to Plaintiff, after firing the shots, he ran past the officers, who were in an unmarked police vehicle. Plaintiff alleges that without any warning or a command, the law enforcement officers opened fire on Plaintiff, hitting him in the back of his legs and the rear of his body. As alleged, the shots caused Plaintiff to sprawl forward on the ground, and once he fell to the ground, Plaintiff released his gun and it slid far out of his reach to the other side of the road. Plaintiff claims that, after the initial shots, he could still feel and move his lower extremities. Significantly, according to Plaintiff, as he was lying on the street face down with his hands extended outward, posing no threat, Officer Bornheimer exited the rear-passenger side door and shot Plaintiff again in the middle of Plaintiff's back; this caused Plaintiff's lower body to go numb. Because of the injuries, Plaintiff is now a paraplegic and permanently disabled.[2] The instant § 1983 action was brought in July 2012 based on these factual

---

[2] Plaintiff was indicted for his acts committed during the subject incident. However, it is unclear from the record on this appeal what specific charges were brought against Plaintiff.

allegations. It is important to note that Plaintiff's excessive force claim is not based on the injuries caused by the initial shots, which appeared to have entered Plaintiff's legs and side torso; rather, the claim centers on the allegedly gratuitous gunshot made by Officer Bornheimer, which entered the area of Plaintiff's lumbar spine. It is Plaintiff's position that his permanent injuries were caused by that specific gun shot.

During the course of the litigation, the parties engaged in extensive discovery, including all medical related issues. During discovery, Plaintiff identified Robert Wood Johnson ("RWJ") as the hospital where he was treated after the incident. Plaintiff underwent emergency surgery performed by on-call trauma surgeons, Drs. George Herlitz and Vicente Garcias. In July 2014, Plaintiff provided the records he obtained from RWJ to Defendant, which contained operative records and diagrams depicting the entry wounds of the bullets. At the request of Defendant, Plaintiff signed an authorization form, pursuant to the Health Insurance Portability and Accountability Act ("HIPAA"), permitting the release of the medical records maintained by RWJ. The standard Form states that Plaintiff gives permission to RWJ to release "[a]ll *records*, new patient reports/questionnaires, original x-ray films, MRI films, CT scan films, bone scan films, intraoperative photographs and/or any other type of films in [RWJ's] possession or control concerning the treatment or care provided to [Plaintiff] . . . ." Pl.'s undated HIPAA Form (emphasis added).

In addition, the Magistrate Judge ordered the Middlesex County Prosecutor's Office ("MCPO") to release all records in its possession regarding the

subject incident, including documents the MCPO had received from RWJ and any recorded interviews conducted with RWJ physicians. Included in those documents are notes from a MCPO investigator, Karleen Duca, that detailed her conversation with Dr. Herlitz, who was one of Plaintiff's treating physicians at the time Plaintiff was hospitalized. The interview took place after Dr. Herlitz performed Plaintiff's surgery. According to the interview notes, it is Dr. Herlitz's opinion that the bullet that entered Plaintiff's torso, which hit Plaintiff's colon, was the same one that severed Plaintiff's spinal cord, causing Plaintiff's permanent injuries. However, Plaintiff produced an expert report from Paul Ratzker, M.D., wherein the doctor noted that Plaintiff suffered a gunshot wound to his lumbar spine, and that his paraplegic conditions were caused by this wound. *See* Ratzker Report dated September 22, 2015.

Defendant, without obtaining any prior authorization from Plaintiff, consulted with Dr. Herlitz concerning the trajectory of the bullets. Defendant also retained Dr. Herlitz as an expert in this case; in that connection, the doctor authored a report in September 2016, upon which Defendant relies in this litigation. In the report, Dr. Herlitz opined that the bullet which entered below Plaintiff's left shoulder blade was not responsible for his neurologic injury; instead, the bullet that fired into Plaintiff's left flank caused his spinal cord injury and its course of travel within his body is most consistent with having been fired into his left side. *See* Herlitz Report dated September 13, 2016. In essence, Dr. Herlitz's opinions contradicted those of Plaintiff's experts.

Fact discovery in this case closed on June 30, 2016, and Plaintiff was directed to serve all expert reports by July 1, 2016, while Defendant was directed to serve his expert reports by September 15, 2016. On September 22, 2016, Plaintiff objected to Dr. Herlitz's report and requested that Defendant be barred from calling Dr. Herlitz as an expert at the time of trial and that the report be barred. A formal motion in that regard was filed by Plaintiff before the Magistrate Judge. In her decision, the Magistrate Judge barred Dr. Herlitz's expert report and trial testimony. The Magistrate Judge reasoned that because Defendant failed to obtain a HIPAA authorization from Plaintiff, Defendant's *ex parte* communications with Dr. Herltiz are in violation of HIPAA, and that Plaintiff did not otherwise waive the confidentiality of his protected health information. *See* Letter Order dated April 7, 2017. Indeed, based on the HIPAA violations, the Magistrate Judge found that preclusion was appropriate:

> Having determined that Defendants were required to obtain a [HIPAA] authorization from Plaintiff before having *ex parte* communications with Dr. Herlitz, the Court turns to whether Dr. Herlitz should be precluded from serving as one of Defendants' experts. Here, the Court finds that preclusion is appropriate. Permitting Defendants to rely upon Dr. Herlitz as a witness despite their failure to obtain a HIPPA authorization from Plaintiff violates [HIPAA] which, in and of itself may warrant preclusion, but permitting Defendants to rely upon Dr. Herlitz as a witness despite their failure to obtain a [HIPAA] authorization from Plaintiff would also be unfairly prejudicial to Plaintiff. Plaintiff would be forced to confront his own trauma surgeon at trial. The fact that Plaintiff's own trauma surgeon takes an adverse position to Plaintiff could have a substantial impact on how the jury views the evidence in this case. Had Defendants secured the requisite [HIPAA] authorization for Dr. Herlitz, Plaintiff would have been on notice of Defendants' communications with Dr. Herlitz and could have developed a trial strategy to address same, but Defendants failed to obtain the necessary authorization.

\* \* \*

. . . Indeed, though this case filed in July 2012, it was not until September 15, 2016 that Defendants identified Dr. Herlitz, by name, as a witness.

*Id.* at p. 5.

In addition, the Magistrate Judge denied Defendant's request to reopen discovery for the sole purpose of retaining a new expert and serving a report and an extension of time to file motions for summary judgment after the expert report is served. The Magistrate Judge found that "Defendants selected their expert at their peril. The Court's decision regarding Dr. Herlitz, M.D. is no different than when an expert is struck on *Daubert* or other substantive grounds. The party is not entitled to retain a substitute." Email Decision dated April 11, 2017.

Defendant's appeal ensued.

## DISCUSSION

### I. Standard of Review

A district court reviews decisions on nondispositive matters by a magistrate judge under the "clearly erroneous or contrary to law" standard. 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72; *Andrews v. Goodyear Tire & Rubber Co.*, 191 F.R.D. 59, 67 (D.N.J. 2000). A decision is clearly erroneous "when, although there may be some evidence to support it, the reviewing court, after considering the entirety of the evidence, is 'left with the definite and firm conviction that a mistake has been committed.'" *Kounelis v. Sherrer*, 529 F. Supp. 2d 503, 518 (D.N.J. 2008) (citations omitted). A decision is contrary to law when it misinterprets or misapplies the law. *Id.* (citation omitted). Under this standard,

the magistrate judge is accorded wide discretion, *NLRB v. Frazier*, 966 F.2d 812, 815 (3d Cir. 1992), and "the party filing the [appeal] bears the burden of demonstrating that the magistrate judge's decision was clearly erroneous or contrary to law." *Marks v. Struble*, 347 F. Supp. 2d 136, 149 (D.N.J. 2004) (citation omitted).

Importantly, "[w]here a magistrate judge is authorized to exercise his or her discretion, the decision will be reversed only for an abuse of that discretion." *Cooper Hosp./Univ. Med. Ctr. v. Sullivan*, 183 F.R.D. 119, 127 (D.N.J. 1998) (citation omitted); *see* 12 Wright, Miller & Marcus, Federal Practice and Procedure: Civil 2d § 3069 (2d ed. 1997). The deferential standard of review is particularly appropriate where the magistrate judge managed the case from the outset, and thus has a thorough knowledge of the proceedings. *Cooper Hosp.*, 183 F.R.D. at 127 (quoting *Public Interest Research Group v. Hercules, Inc.*, 830 F. Supp. 1525, 1547 (D.N.J. 1993), *aff'd on other grounds and rev'd on other grounds*, 50 F.3d 1239 (3d Cir. 1995)).

Here, while the parties, generally, do not dispute that the Magistrate Judge's ruling to bar Dr. Herlitz's report and testimony — a nondispositive decision — be reviewed under the clearly erroneous standard, Defendant, nonetheless, argues that this Court should treat, for the purposes of this appeal, the Magistrate Judge's decision as dispositive and review it *de novo*. Defendant reasons that if the Magistrate Judge's rulings were to stand, "Plaintiff's presentation to a finder of fact would be misleading as it is not supported by the evidence and does not aid in the search for the truth." Def.'s Br., p. 8. Defendant

goes on to argue that "[i]f [he] cannot contradict Plaintiff's expert reports with the information explained by Dr. Herlitz, or another trauma surgeon, [Defendant] will be severely prejudiced from presenting critical evidence to a jury, which would be inconsistent with the Court's function." *Id.* In other words, Defendant claims that because the ruling would severely impair his defenses at trial, this Court should elevate a clearly nondispositive ruling to a dispositive one, such that Defendant's interests would be protected at trial. However, I have not been able to locate, and Defendant has not cited any, case law for such a novel legal proposition. Contrary to Defendant's arguments, applying the appropriate standard of review does not turn on how a Magistrate Judge's ruling would ultimately affect a party's interests; rather, it is the nature of a decision that dictates the proper level of review. Indeed, any adverse decision against a party, including those that are nondispositive, can impair a party's litigation strategy or defenses. As such, I find Defendant's argument in this context without merit. The Magistrate Judge's decision on this appeal will be reviewed under the clearly erroneous standard.

## II.     HIPAA

The Magistrate Judge determined that the knowledge of Dr. Herlitz was confidential because it was gained through his examination of Plaintiff; that knowledge is protected by HIPAA. On appeal, Defendant first argues that he has complied with HIPAA requirements because Plaintiff authorized the release of the records maintained by RWJ, and based on that authorization, Plaintiff has permitted Dr. Herlitz, as an employee of RWJ, to release medical records

authored by the doctor. Defendant further argues that because there is no federal common law of physician-patient privilege, New Jersey's privilege applies, and in that respect, Plaintiff has waived the privilege by placing his medical condition in issue. Defendant's arguments are contrary to law.

Neither the Magistrate Judge's decision nor the parties' briefings contain any discussion regarding HIPAA's statutory scheme, or the interplay of the federal health information protection laws and New Jersey's statutory or common law counterpart. Because HIPAA and New Jersey's physician-patient privilege are important to the resolution of the issues on appeal, I will discuss the relevant laws in detail.[3]

In 1996, Congress passed HIPAA, 42 U.S.C. 1320d *et seq.*, which governs the dissemination of protected health information. "[Through] HIPAA, Congress has spoken about the protection that must be extended to patients regarding their health related information." *EEOC v. Boston Mkt. Corp.*, No. CV 03-4227, 2004 U.S. Dist. LEXIS 27338, at *7 (E.D.N.Y. Dec. 16, 2004) (internal quotations omitted); *Wade v. Vabnick-Wener*, 922 F. Supp. 2d 679, 685 (W.D. Tenn. 2010); *Nw. Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 924 (7th Cir. 2004). This statute is also "a complex piece of legislation that addresses the exchange of health-related information," *Nat'l Abortion Fed'n v. Ashcroft*, No. 03-8695, 2004 U.S. Dist.

---

[3]     Unfortunately, neither the Third Circuit nor courts in this district have squarely addressed the issues in this case. In fact, there is a dearth of case law nationwide regarding HIPAA in the context of the issues presented on this appeal. Thus, this Court examines the relevant out-of-circuit authorities that have discussed HIPAA violations pertaining to unauthorized *ex parte* communications.

LEXIS 4530, at *5 (S.D.N.Y. Mar. 19, 2004), which has "radically changed the landscape of how litigators can conduct informal discovery in cases involving medical treatment." *Law v. Zuckerman*, 307 F. Supp. 2d 705, 711 (D. Md. 2004). Indeed, HIPAA embodies federal government's recognition of "the importance of protecting the privacy of health information in the midst of the rapid evolution of health information systems." *South Carolina Med. Assoc. v. Thompson*, 327 F.3d 346, 348 (4th Cir. 2003).

In order to accomplish such tasks, Congress delegated to the Secretary of Health and Human Services broad authority to promulgate rules and regulations protecting the privacy of patient health information. *Nw. Mem'l Hosp.*, 362 F.3d at 924 (citing 42 U.S.C. § 1320d-2(d)). These regulations impose strict limitations on the ability of certain health care providers to release a patient's medical records or discuss medical history without express consent. *Zukerman*, 307 F. Supp. 2d at 710-11.

HIPAA's preemption provision provides that the statute and the regulations promulgated thereunder supersede "any contrary provision of State law" except as provided in 42 U.S.C. § 1320d-7(a)( 2). *See* 42 U.S.C. § 1320d-7(a)(1). The regulations define a "state law" to "mean a constitution, statute, regulation, rule, common law, or other State action having the force and effect of law." 45 C.F.R. § 160.202. State laws are contrary to HIPAA if: (1) it would be impossible for the health care provider to comply simultaneously with HIPAA and the state directive; or (2) the state provision stands as an obstacle to the accomplishment of the full objectives of HIPAA. 45 C.F.R. § 160.202.

However, on the other hand, HIPAA does not preempt state law that is "more stringent" than the provisions of HIPAA or its regulations. *Nw. Mem'l Hosp.*, 362 F.3d at 926 (citing 45 C.F.R. § 160.203(b)); *Zuckerman*, 307 F. Supp. 2d at 709; *Cong. v. Tillman*, No. 09-10419, 2009 U.S. Dist. LEXIS 50501, at *3 (E.D. Mich. June 16, 2009); *Stewart v. Louisiana Clinic*, No. 99-1767, 2002 U.S. Dist. LEXIS 24062, at *9 (E.D. La. Dec. 12, 2002). To meet the "more stringent" requirement, a state law must "provide[ ] greater protection for the individual who is the subject of the individually identifiable health information" than the standard set forth by HIPAA and its regulations. 45 C.F.R. § 160.202(6). Stated differently, state law is more stringent if it "prohibits or restricts a use or disclosure in circumstances upon which such use or disclosure," HIPAA would otherwise permit. 45 C.F.R. § 160.202. Accordingly, the Court must determine whether HIPAA preempt state law in this case.

In deciding preemption in this context, the Court must first examine Federal Rule of Evidence 501. Rule 501 states that "privilege" is interpreted pursuant to federal common law except that "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." Fed R. Evid. 501. Although the state of New Jersey has legislated a physician-patient privilege, *see* N.J.S.A. 2A:84A-22.2, state privilege laws do not govern in federal question cases. *See Wm. T. Thompson Co. v. General Nutrition Corp.,* 671 F.2d 100, 103 (3d Cir. 1982). However, where state law provides the rule of decision, such as in diversity cases, state privilege law will govern. *Samuelson v. Susen*, 576 F.2d 546, 549-50 (3d Cir. 1978). Thus, it is necessary

to determine whether federal common law or the New Jersey state statute applies to the doctor-patient privilege at issue. "To do so, a district court in a federal proceeding must examine the claims for which the discovery is sought and the basis for the Court's jurisdiction." *Hannah v. Wal-Mart Stores, Inc.*, No. 12-1361, 2014 U.S. Dist. LEXIS 75745, at *16 (D. Conn. Jun 4, 2014) (citation omitted).

Here, Plaintiff invokes the subject matter of this Court pursuant to 28 U.S.C. § 1331, "federal claim" jurisdiction with respect to his § 1983 causes of action. Although Plaintiff also raises state law claims under the New Jersey Civil Rights Act, along with his federal claims, the privileges recognized under federal law, *i.e.*, those privileges recognized by Rule 501, govern here. *See Pearson v. Miller*, 211 F.3d 57, 65-66 (3d Cir. 2000) (explaining that federal privilege law is applicable to cases presenting federal and state law claims). Indeed, where there is federal question jurisdiction and the evidence sought is relevant to both federal and state law claims, the privileges involved in the case are governed by the principles of federal law. *See von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 141 (2d Cir. 1987), *cert. denied sub. nom.*, *Reynolds v. von Bulow by Auersperg*, 481 U.S. 1015 (1987); *Ziemann v. Burlington Cnty Bridge Comm'n*, 155 F.R.D. 497, 503 (D.N.J. 1994) ("[W]here federal jurisdiction is based upon the presence of federal claims (although there are state law claims as well), Rule 501 mandates that the federal common law of privileges applies"). Thus, contrary to Defendant's argument, state law physician-patient privilege does not apply here.

However, it is well-settled that the federal common law does not recognize a physician-patient privilege. *See Whalen v. Roe*, 429 U.S. 589, 608 n.28 (1977)*; Lentz v. Graco Inc.*, No. 05–3047, 2007 U.S. Dist. LEXIS 59282, at *12 (D.N.J. Aug. 14, 2007) (noting that "there is no federal physician-patient privilege" (citation omitted)); *Acquarola v. Boeing Co.*, No. 03–2486, 2004 U.S. Dist. LEXIS 4495, at *10 (E.D. Pa. Feb. 26, 2004) (asserting that "[n]either federal common law nor federal statutory law recognizes a broad physician-patient privilege" (citation omitted)); *Sarko v. Penn-Del Directory Co.*, 170 F.R.D. 127, 131 (E.D. Pa. 1997) (noting that, "the federal common law does not recognize a more general physician-patient privilege") (citations omitted). Hence, without a recognized privilege in this context, the Court must defer to HIPAA's privacy rules to determine whether Defendant can engage in *ex parte* communications with Dr. Herlitz, pursuant to Fed. R. Evid. 501's savings clause. *See Nat'l Abortion Fed'n*, 2004 U.S. Dist. LEXIS 4530, at *19-20 ("Rule 501's savings clause requires federal courts to fashion common law in the light of reason and experience . . . when Congress has not spoken to a particular issue," but because "Congress has spoken on the privacy of medical records through HIPAA, HIPAA and the regulations promulgated thereunder . . . control the protections provided to patient medical records held by hospitals" in federal question cases. (internal citations, alterations, and quotations omitted)); *see, e.g., Hannah*, 2014 U.S. Dist. LEXIS, at *17-19; *see also* 45 C.F.R. § 160.512(b)(11).

As I have indicated earlier, as its general privacy rule, HIPAA places strict limitations on the ability of health care providers to release a patient's medical

records or discuss the patient's medical history without the consent of the

patient. HIPAA's privacy rules set forth standards and procedures for the

collection and disclosure of "protected health information." The information

includes:

> [any information, whether oral or recorded in any form or medium, that]:
>> (1) [i]s created or received by a health care provider, health plan, employer, or health care clearinghouse; and
>>
>> (2) Relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and
>>
>>> (i) That identifies the individual; or
>>>
>>> (ii) With respect to which there is a reasonable basis to believe the information can be used to identify the individual.

45 C.F.R. § 160.103 (defining "individually identifiable health information,"

which generally encompasses "protected health information"). These rules

establish patients' rights and require that health professionals implement

various procedures regarding the use of and access to health care information.

HIPAA prohibits "covered entities" from using and disclosing private health

information as required or permitted by the regulations. 45 C.F.R. § 164.501

and § 160.103. There are three categories of "covered entities": 1) health plans;

2) health care clearinghouses; and 3) health care providers. 45 C.F.R. § 160.103.

Relevant here, health care provider means a "provider of service" (as defined in

42 U.S.C. § 1395x(u)), a provider of "medical and other health services" (as

defined in 42 U.S.C. § 1395x(s)), and any other person or organization who

furnishes, bills, or is paid for health care in the normal course of business. 45 C.F.R. § 160.103. Indeed, these rules are expansively interpreted to protect patient's privacy. *See Smith v. Am. Home Prods. Corp. v. Wyeth-Ayerst Pharm.*, 372 N.J. Super. 105, 111 (Law Div. 2003).

Importantly, the privacy rules prohibit covered entities, including health care providers, from using or disclosing private health information in any form oral, written or electronic, except as permitted under the rules. 45 C.F.R. § 164.502(a). Indeed, the regulations provide certain exceptions to the general rule against disclosure of patient health information without the patients' prior written consent.

One such exception relates to the disclosures made in connection with judicial and administrative proceedings. *See* 45 C.F.R. § 164.512(e). Health care providers may disclose protected health information within judicial and administrative proceedings according to the following guidelines:

> (1) Permitted disclosures. A covered entity may disclose protected health information in the course of any judicial or administrative proceeding:
>
>> (i) In response to an order of a court or administrative tribunal, provided that the covered entity discloses only the protected health information expressly authorized by such order; or
>>
>> (ii) In response to a subpoena, discovery request, or other lawful process, that is not accompanied by an order of a court or administrative tribunal, if
>>
>>> (A) The covered entity receives satisfactory assurance . . . from the party seeking the information that reasonable efforts have been made by such party to ensure that the individual who is the subject of the

protected health information that has been requested has been given notice of the request; or

(B) The covered entity receives satisfactory assurance . . . from the party seeking the information that reasonable efforts have been made by such party to secure a qualified protective order that meets the requirements of paragraph (e)(1)(v) of this section.

45 C.F.R. § 164.512(e)(1). The Secretary defines "satisfactory assurance" as "a

written statement and accompanying documentation" which demonstrates that:

(A) the party requesting such information has made a good faith attempt to provide written notice to the individual (or, if the individual's location is unknown, to mail a notice to the individual's last known address);

(B) The notice included sufficient information about the litigation or proceeding in which the protected health information is requested to permit the individual to raise an objection to the court . . .; and

(C) The time for the individual to raise objections to the court . . . has elapsed, and:

(1) No objections were filed; or

(2) All objections filed by the individual have been resolved by the court . . . and the disclosures being sought are consistent with such resolution.

45 C.F.R. § 164.512(e)(1)(iii). Significantly, a proper protective order must both

prohibit the parties from using or disclosing the patient's health information for

any purpose not related to the judicial proceeding in which its production was

ordered and require that the parties return or destroy the disclosed information

(as well as all copies made thereof) at the end of the proceedings. 45 C.F.R. §

164.512(e)(1)(v).

In sum, the HIPAA regulations allow health care providers to disclose patient health information in connection with judicial proceedings: (1) in response to an order of the court, but only to the extent allowed by the language of the order; or (2) in response to a subpoena or formal discovery request where the requesting party assures the provider that either the patient was made aware of the request but did not object or the requesting party has made reasonable efforts to secure a proper protective order. *See Wade, 922 F. Supp. 2d at 687; Zuckerman*, 307 F. Supp. 2d at 711; *Boston Mkt*, 2004 U.S. Dist. LEXIS 27338, at *15; *Nat'l Abortion Fed'n*, 2004 U.S. Dist. LEXIS 4530, at *7; *see also* 45 C.F.R. § 164.512(e)(1)(i), (ii). To be sure, under HIPAA, judicial oversight is essential.

More specifically, relevant to this case, courts are cautious in permitting defense counsel from engaging in *ex parte* communications with plaintiff's physicians, in line with HIPAA's underlying strong policy against disclosing patient health information. It is the collective conclusion of courts across the country that although *ex parte* communications are not *per se* prohibited by HIPAA, when notice was not given to Plaintiff in advance of the communications and Plaintiff has not expressly authorized disclosure, counsel must at the very least secure a qualified protective order consistent with HIPAA's privacy rules. *See Bayne v. Provost*, 359 F. Supp. 2d 234, 241 (N.D.N.Y. 2005) ("We may reasonably infer that if a qualified protective order . . . was in place then an *ex parte* discussion with the health provider would be appropriate." (internal citations omitted)); *Tillman*, 2009 U.S. Dist. LEXIS 50501, at *4 (E.D. Mich. June 16, 2009) ("[D]efendants may conduct an *ex parte* oral interview with [plaintiff's]

physician if a qualified protective order . . . is first put in place." (alteration original) (quoting *Holman v. Rasak*, 761 N.W.2d 391, 395 (Mich Ct. App. 2008))); *Palazzolo v. Mann*, No. 09-10043, 2009 U.S. Dist. LEXIS 22348, at *8 (E.D. Mich. Mar. 19, 2009) (finding that defendants may conduct *ex parte* interviews with plaintiff's treating physicians, provided that HIPAA judicial requirements are met, such as obtaining a protective order)); *Croskey v. BMW of N. Am.*, No. 02-73747, 2005 U.S. Dist. LEXIS 43442, at *13 (E.D. Mich. Nov. 14, 2005) ("A qualified protective [order] requires neither specific notice to Plaintiff's counsel nor Plaintiff's consent before Defendant may interview Plaintiff's treating physician *ex parte*."); *Crenshaw v. Mony Life Ins. Co.*, 318 F. Supp. 2d 1015, 1029 (S.D. Cal. 2004) (finding that in the absence of express authorization, "HIPAA does not [permit] *ex parte* contacts with healthcare providers," without a protect order in place); *Zuckerman*, 307 F. Supp. 2d at 710 ("Counsel should now be far more cautious in their contacts with medical fact witnesses to ensure that they do not run afoul of HIPAA's regulatory scheme."); *Boston Mkt.*, 2004 U.S. Dist. LEXIS 27338, at *20-21 ("The strong policy underlying HIPAA would appear to trump the reasoning of those pre-HIPAA decisions that allowed defense counsel *ex parte* access to plaintiff's treating physicians . . . .").

Here, at the outset, I note that by authorizing Defendant to obtain *records* from RWJ, Plaintiff did not authorize Defendant to conduct *ex parte* communications with Plaintiff's treating surgeon, Dr. Herlitz.[4]    Indeed, the

---

[4]    Contrary to Defendant's assertions, Dr. Herlitz, as a medical provider, qualifies as one of the "covered entities" under HIPAA, and as a result, the doctor

language of the scope of the authorization is quite clear: "[a]ll records, new patient reports/questionnaires, original x-ray films, MRI films, CT scan films, bone scan films, intraoperative photographs and/or any other type of films in [RWJ's] possession or control concerning the treatment or care provided to [Plaintiff] . . . ." Pl.'s undated HIPAA Form. No credible argument can be made that this language authorized the release of anything beyond Plaintiff's records. This authorization does not contemplate nor authorize Defendant's counsel to inquire about or otherwise receive other aspects of the Plaintiff's medical information, especially posing a series of questions about Plaintiff's condition to his treating surgeon. As such, Defendant's argument that the authorization provided for the communication under HIPPA is unpersuasive to say the least. *See* 42 U.S.C. § 1320d-2 (stating that the intent of HIPAA is to ensure the integrity and confidentiality of patients' medical information and to protect against unauthorized uses or disclosures of the information); *see also Nw. Mem'l Hosp.*, 362 F.3d at 924; *Maillaro v. New York Presbyterian Hosp.*, No. 10-3474, 2011 U.S. Dist. LEXIS 117467, at *6 (D.N.J. Oct. 12, 2011). Rather, the authorization must have contained an express consent to speak to Dr. Herlitz, not simply a consent to obtain records.

Next, Defendant insists that the type of information disclosed by Dr. Herlitz is not private health information entitled to protection under HIPAA or

---

is mandated by HIPAA from disclosing Plaintiff's private health information, without satisfying one of the exceptions of disclosure contained in HIPAA.

New Jersey's physician-patient privilege.[5]  Defendant's argument is incorrect. As preliminary matter, there is no dispute that Defendant did not receive express consent from Plaintiff before speaking to Dr. Herlitz on an *ex parte* basis.  Indeed, as noted earlier, Plaintiff's consent was limited to physical records from RWJ. Also, there is no dispute that defense counsel did not seek a protective order or otherwise comply with HIPAA regulations, *i.e.*, formal discovery request or subpoena.  Accordingly, Defendant's *ex parte* communications with Dr. Herlitz clearly ran afoul of HIPAA, and it follows that any information obtained by Defendant as a result of consulting with Dr. Herlitz violated HIPAA.

Furthermore, contrary to Defendant's argument, the information that defense counsel sought from Dr. Herltiz is clearly protected by HIPAA.  Indeed, under HIPPA, private health information includes any information, whether oral or recorded in any form or medium, that: (1) is created by a health care provider, health plan, public health authority, employer, life insurer, school or university or health care clearinghouse; and (2) relates to the past, present or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present or future payment for the provision of health care to an individual.  *See* 45 C.F.R. § 160.103 (various provisions). There is no doubt, under that regulation, the information obtained by Dr. Herlitz in treating Plaintiff is squarely protected by HIPAA.  As the Magistrate Judge noted in her decision, Dr. Herlitz's expert opinions were based, in part, on the

---

[5]     Because New Jersey's physician-patient privilege does not govern in this federal question case, all of Defendant's legal arguments based on that privilege are without merit.

information he obtained while providing medical care to Plaintiff as his trauma surgeon, in addition to a review of Plaintiff's medical records. As such, in order to engage in *ex parte* communications with Dr. Herlitz, Defendant was required to adhere to HIPAA disclosure rules made in connection with judicial and administrative proceedings. *See* 45 C.F.R. § 164.512(e)(1).

Moreover, Defendant argues, under New Jersey law, that Plaintiff has waived his physician-patient privilege by filing this lawsuit and placing his medical condition at issue. Defendant's argument is incorrect for many reasons. For one, New Jersey's physician-patient privilege does not control in this federal question case. Thus, any state authorities upon which Defendant rely are not relevant. Second, it may well be that *before* the enactment of HIPAA, the filing of a lawsuit for personal injury or malpractice may waive the state common law physician-patient privilege with respect to any injury, disease, or condition at issue in the lawsuit; however, importantly, following the enactment of HIPAA, the filing of a lawsuit does not waive the confidentiality of health information, unless the patient gives written consent, *see* 45 C.F.R. §§ 164.508, 164.510, or counsel obtains a court order. *See Soto v. ABX Air, Inc.*, No. 07-11035, 2010 U.S. Dist. LEXIS 117116, at *3 (E.D. Mich. Nov. 3, 2010); *Tillman*, 2009 U.S. Dist. LEXIS 50501, at *3-4; *Graham v. Carroll*, No. 10-065, 2011 U.S. Dist. LEXIS 29190, at *5 (N.D. Fla. Mar. 9, 2011)(finding that under HIPAA, "[t]he fact that the Plaintiff has filed a lawsuit placing his medical condition in issue does . . . waive the confidentiality of health information, and unless the patient gives written consent[,] the medical provider may only disclose confidential health

information under the steps outlined in HIPPA."); *Murphy v. Dulay*, 975 F. Supp. 2d 1200, 1204 (N.D. Fla. 2013), *vacated on other grounds*, 768 F.3d 1360 (11th Cir. 2014). Based on these foregoing determinations, I conclude that the Magistrate Judge did not clearly err when finding that Defendant violated HIPAA disclosure rules.

Next, the Court determines whether the Magistrate Judge abused her discretion when she disqualified Dr. Herlitz as an expert in this case. "Federal courts have the inherent power to disqualify experts" in certain circumstances to protect the integrity of the adversary process and to promote public confidence in the legal system. *Koch Refining Co. v. Jennifer L. Boudreaux MV*, 85 F.3d 1178, 1181 (5th Cir. 1996) (citations omitted); *see Syngenta Seeds, Inc. v. Monsanto Co.*, No. 02-1331, 2004 U.S. Dist. LEXIS 19817, at *4 (D. Del. Sept. 27, 2004); *United States ex rel., Cherry Hill Convalescent Ctr., Inc. v. Healthcare Rehab Sys., Inc.*, 994 F. Supp. 244, 248 (D.N.J. 1997); *Butamax Advanced Biofuels LLC v. Gevo, Inc.*, 2012 U.S. Dist. LEXIS 145880, at *4 (D. Del. Oct. 10, 2012); *Greene, Tweed of Del., Inc. v. DuPont Dow Elastomers*, L.L.C., 202 F.R.D. 426, 428 (E.D. Pa. 2001). A court derives its power to disqualify from the "duty to preserve confidence in the fairness and integrity of judicial proceedings, and to protect privileges which may be breached if an expert is permitted to switch sides in pending litigation." *Novartis AG v. Apotex Inc.*, No. 09-5614, 2011 U.S. Dist. LEXIS 15177, at *3 (D.N.J. Jan. 24, 2011).

In determining disqualification, courts use a two-prong test to determine whether an expert who had a prior relationship with a party should be

disqualified: (1) whether it was "objectively reasonable for the first party . . . to believe that a confidential relationship existed"; and (2) whether "that party disclose[d] any confidential information to the expert." *Cherry Hill*, 994 F. Supp. at 249 (quoting *Cordy v. Sherwin-Williams Co.*, 156 F.R.D. 575, 579 (D.N.J. 1994)).

Courts should also balance competing policy objectives in determining whether an expert should be disqualified. *Cordy*, 156 F.R.D. at 580. The policy objectives in favor of disqualification "include the court's interest in preventing conflicts of interest and in maintaining judicial integrity." *Cherry Hill*, 994 F. Supp. at 251 (citation omitted). The policy objectives weighing against disqualification "include maintaining accessibility to experts with specialized knowledge and encouraging experts to pursue their professions." *Id.* (citation omitted). The party seeking disqualification, bears the burden of proof on these issues. *Cordy*, 156 F.R.D. at 580 (citation omitted).

Here, the Magistrate Judge found that Plaintiff had carried his burden of proof as to disqualification; the Judge based her decision on the fact that Defendant violated Plaintiff's confidentiality under HIPAA. I do not find that the Magistrate Judge abused her discretion. As this Court has already stated, Congress enacted HIPAA to advance its interests in protecting a patient's private health information from unauthorized and abusive disclosures. HIPAA and its regulations is clear: this "strong policy" cannot be circumvented by medical providers or counsel in litigation. When HIPAA violations occur, it is within the court's purview to impose the proper sanctions. *See* Crenshaw, 318 F. Supp. 2d

at 1030; *Zuckerman*, 307 F. Supp. 2d 705, at 712-13; *Belote v. Strange*, No. 262591, 2005 Mich. App. LEXIS 2642, *16-17 (Mich. App. Ct. October 25, 2005) (treating a HIPAA violation as a sanctionable discovery violation under state court rules, and finding that "[a]s with every discovery violation, whether and in what manner the violation should be sanctioned is a matter committed to the sound discretion of the court.").

As the Magistrate Judge noted, it is clear that Defendant was aware that Plaintiff and Dr. Herlitz had a prior confidential, physician-patient relationship. And, the Court has already determined that as a result of that relationship, Dr. Herlitz possesses confidential health information pertaining to Plaintiff. Indeed, while Plaintiff did not designate Dr. Herlitz as an expert or a fact witness, defense counsel, nonetheless, conceded that he engaged in *ex parte* communications with Dr. Herlitz seeking explanation of Plaintiff's medical records obtained from RWJ. Defense counsel further concedes that, without any notice to Plaintiff or the Court, counsel consulted with Dr. Herlitz and, in fact, hired the doctor as a defense expert. Dr. Herlitz, then, authored a report, dated, September 13, 2016 — two days prior to Defendant's deadline to serve his expert report. Under these circumstances, the Magistrate Judge did not err by finding that Plaintiff had satisfied the two-prong test.

Furthermore, the policy objectives favor disqualification. The practice of unqualified *ex parte* communications with a plaintiff's treating physician when examined under federal principles has been heavily criticized by some district courts. *See Terrebonne v. B & J Martin, Inc.*, No. 16-8630, 2017 U.S. Dist. LEXIS

38635, at *11-14 (E.D. La. Mar. 17, 2017) (collecting cases). Indeed, it is the collective view of those courts that because the physician-patient relationship is based on the time-honored tradition of mutual trust, the unauthorized communications with physicians by defense counsel undermines that relationship and erodes its trust and confidence. *See In re Xarelto (Rivaroboxan) Prod. Liab. Litig.*, MDL No. 2592, 2016 U.S. Dist. LEXIS 30822, at *17-18 (E.D. La. Mar. 9, 2016) (finding that "[t]he physician-patient relationship is based on mutual trust, and *ex parte* contacts between physicians and defendants . . . undermine that relationship. No patient wants to hear that his or her doctor engaged in unsupervised discussions with a person that the patient sued. This may lead the patient to be less forthcoming with doctors who have spent years developing a relationship of trust and confidence"); *In re Vioxx Prods. Liab. Litig.*, 230 F.R.D. 473, 477 (E.D. La. 2005). Here, while Plaintiff's relationship with Dr. Herlitz may not have been longstanding, nonetheless, from a policy perspective, like the Magistrate Judge, this Court finds defense counsel's violation of HIPAA and the long established physician-patient trust, to be deeply troubling. Accordingly, the Magistrate Judge was well within her discretion to disqualify Dr. Herlitz as an expert witness and did not err by striking the doctor's report.

I also agree with the Magistrate Judge's finding that defense counsel enlisted the help of Dr. Herlitz at his own peril. I am cognizant that by disqualifying Dr. Herlitz, Defendant would be deprived of proffering an expert to refute Plaintiff's evidence on the issue of causation. However, given the inappropriate conduct on the part of the defense, the Magistrate Judge exercised

her sound discretion to preclude Defendant from obtaining a new expert at this late stage of litigation. I so conclude because defense counsel had more than sufficient time to obtain an authorization from Plaintiff before engaging Dr. Herlitz; indeed, counsel sought Plaintiff's authorization before procuring RWJ's medical records. In that regard, defense counsel clearly knew his obligations under HIPAA, yet, counsel deliberately had *ex parte* communications with Dr. Herlitz — without notifying Plaintiff or securing the necessary court order — blatantly disregarding Plaintiff's private health information protected by HIPAA. Compounding counsel's errors, Plaintiff was only made aware that his treating surgeon had become Defendant's causation expert in September 2016, when discovery concluded. It appears that defense counsel engaged in litigation by surprise — conduct this Court simply cannot ignore. Therefore, it was not an abuse of discretion for the Magistrate Judge to disallow defense counsel from obtaining a new expert, while acknowledging that some prejudice will inure to Defendant.[6]

---

[6]     Indeed, Defendant provides no explanation why formal discovery was not taken of Dr. Herlitz, on notice to Plaintiff, and then an independent expert retained.

**CONCLUSION**

For the reasons set forth above, Defendant's appeal of the Magistrate Judge's decision is **DENIED**. The Magistrate Judge's decision dated April 7, 2017, is hereby **AFFIRMED**. More specifically, the Magistrate Judge's decision to disqualify Dr. Herlitz as an expert and to strike Dr. Herlitz's report is affirmed, and Defendant is precluded from obtaining a new expert.

DATE:   November 21, 2017                    /s/ Freda L. Wolfson_____
                                             Freda L. Wolfson, U.S.D.J.