**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____

| | | |
|---|---|---|
| VICTOR RODRIGUEZ, | : | |
| | : | |
| Plaintiff, | : | Civ. Action No.: 12-4722(FLW) |
| | : | |
| v. | : | |
| | : | |
| THE CITY OF NEW BRUNSWICK, | : | |
| THE NEW BRUNSWICK POLICE | : | |
| DEPARTMENT, MAYOR JAMES | : | |
| CAHILL, POLICE OFFICER | : | |
| CHRISTOPHER BORNHEIMER, | : | |
| POLICE OFFICER ANDREW WEISS, | : | **OPINION** |
| POLICE DIRECTOR ANTHONY | : | |
| CAPUTO, THE COUNTY OF | : | |
| MIDDLESEX, THE MIDDLESEX | : | |
| COUNTY SHERIFF'S DEPARTMENT, | : | |
| MIDDLESEX COUNTY SHERIFF | : | |
| MILDRED S. SCOTT, ABC | : | |
| ENTITIES 1-5 (as yet unidentified | : | |
| entities), and JOHN DOES 1-5 | : | |
| (as yet : unidentified entities) | : | |
| | : | |
| Defendants. | : | |
| | : | |

_____ :

**WOLFSON, United States District Judge:**

Presently before the Court is a Motion for Summary Judgment filed by Defendant

Police Officer Christopher Bornheimer ("Defendant" or "Officer Bornheimer"). The

instant action arises out of Plaintiff Victor Rodriguez's ("Plaintiff") claims that Defendant[1]

---

[1]    In his complaint, Plaintiff also names the City of New Brunswick, New Brunswick
Police Department, Mayor James M. Cahill, Police Director Anthony Caputo, Detective
Andrew Weiss ("Detective Weiss"), the County of Middlesex, the Middlesex County
Sheriff's Department, and Middlesex County Sheriff Mildred S. Scott as Defendants
(collectively, "Dismissed Defendants"). Pursuant to the Parties' stipulations, this Court

violated Plaintiff's civil rights, pursuant to 42 U.S.C. § 1983 and the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 *et seq.*, by shooting Plaintiff to effectuate his arrest, after Plaintiff had already been shot three times, which constituted excessive force in violation of the Fourth Amendment and Article One Section Seven of the New Jersey constitution.

On this motion, Defendant argues that summary judgment is proper because: (1) his use of force was objectively reasonable; (2) he is entitled to qualified immunity; and (3) the grand jury's finding of no cause to indict Defendant precludes a finding that Defendant used excessive force against Plaintiff. Plaintiff opposes the motion. For the following reasons, Defendant's Motion for Summary Judgment is **DENIED**.

### FACTUAL BACKGROUND[2]

On January 31, 2012, Officer Bornheimer, Detective Weiss, and Sheriff's Officer Louis Suarez ("Officer Suarez"), were working within the Street Crimes Unit, patrolling the Remsen Avenue corridor for gang activity, which was known as a high crime area in the City of New Brunswick. *See* Dismissed Defendants' Undisputed Statement of Facts ("DDUSF") ¶¶ 24, 26, 41; Deposition Transcript of Officer Christopher Bornheimer ("Bornheimer Dep."), at 28:1-5; Deposition Transcript of Detective Andrew Weiss ("Weiss Dep."), at 56:1-7. At 6:14 p.m., as they were patrolling, they parked their unmarked police vehicle behind a white vehicle at the corner of Remsen Avenue and Seaman Street. DDUSF ¶ 76; O'Connor Certification, Ex. 45, Chapter 1 ("Surveillance

---

dismissed *with prejudice* Plaintiff's claims against each of these Defendants. *See* ECF No. 79, 81, 107, 113. Accordingly, Plaintiff's only remaining claims are against Officer Bornheimer.

[2] The Court will only recount the necessary facts to resolve the instant motion.

Video 1") and Chapter 2 ("Surveillance Video 2"); Deposition Transcript of Tamarra Cathcart ("Cathcart Dep."), at 11:8-17; Deposition Transcript of Herinson Rodriguez ("Herinson Rodriguez Dep."), at 116:2-3. They called dispatch to run the license plate of the white vehicle due to back-and-forth yelling from various people who were standing around the vehicle. DDUSF ¶ 76; Weiss Dep. 74:8-15, 75:9-18, 77:7-21. The driver's side front window of the unmarked police vehicle was partially open, Weiss Dep. 68:9-15, and it was dark outside, DDUSF ¶ 57; Deposition Transcript of Antony Rodriguez ("Antony Rodriguez Dep."), at 100:19-21; Herinson Rodriguez Dep. 148:6-8; Deposition Transcript of Victor Rodriguez ("Plaintiff's Dep.), at 136:10-25; Surveillance Video 1 and Surveillance Video 2; Julia Lockett Grand Jury Testimony 166:4.

All of the facts that follow occurred in a short amount of time and the parties offer conflicting details in their accounts of the incident. From the time the law enforcement officers called dispatch to run the license plate to the time they called to report "shots fired," 15 seconds elapsed. DDUSF ¶ 109; O'Connor Certification, Ex. 46. Thus, while I recount a scene-by-scene narrative of Plaintiff's arrest, I emphasize that the following incident took place over a matter of seconds. Importantly, there are two surveillance videos, which show a version of the facts different from the versions advanced by the parties.[3] *See* Surveillance

_____

[3]      Much, but not all, of the incident at issue in this matter was captured by the two surveillance videos positioned at the corner of Remsen Avenue and Seaman Street overlooking the white vehicle and the unmarked police vehicle. The parties do not argue that the surveillance videos were "doctored or altered in any way, nor [contend] that what it depicts differs from what actually happened" in this case. *Scott v. Harris*, 550 U.S. 372, 378 (2007). Because the surveillance videos are the best evidence of what occurred in this case, the Court need not make credibility determinations concerning the testimony of Defendants, as would be inappropriate on summary judgment, nor will I draw inferences in Plaintiff's favor that are inconsistent with the events depicted in the surveillance videos. *See id.* at 380–81 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court

Video 1 and Surveillance Video 2. Hence, each perspective—the footage captured by the surveillance videos, Plaintiff's account, and Defendant's account—is recounted separately in the factual background below.

### A. Facts According to Surveillance Videos[4]

At 2:32 in Surveillance Video 1 and 3:22 in Surveillance Video 2, the unmarked police vehicle comes to a full stop behind the white vehicle. Similar to the white vehicle, the unmarked police vehicle is facing west on Seaman Street towards the corner of Seaman Street and Remsen Avenue. *See* O'Connor Certification, Ex. 42, Andrew J. Winter Crime Scene Investigation ("Crime Scene Map"). At 3:22 in Surveillance Video 2, a group of four people cross into the street from the southeast corner of Seaman Street and Remsen Avenue, walking towards the driver's side of the white vehicle. Three people remained standing on the southeast corner of Seaman Street and Remsen Avenue. The four people congregated around the white vehicle on the driver's side. Within the next second or two, the law enforcement officers called dispatch to run the license plate of the white vehicle. DDUSF ¶ 76; Weiss Dep. 75:9-11, 77:4-21; O'Connor Certification, Ex. 46.

At 3:29 in Surveillance Video 2, two people cross into Seaman Street from the southeast corner, next to El Rancho Restaurant, *see* Crime Scene Map, walking towards

---

should not adopt that version of the facts for purposes of ruling on a motion for summary judgment . . . [rather, a court] should . . . view[ ] the facts in the light depicted by the videotape."); *see also Shuman v. Raritan Twp.*, No. 14-3658, 2016 WL 7013465, at *2 (D.N.J. Nov. 30, 2016). Accordingly, wherever possible, I have relied upon the surveillance videos to state the facts of this case.

[4]     The facts below, unless otherwise noted, are taken from the footage of Surveillance Video 1 and Surveillance Video 2 (collectively, "Surveillance Videos"). Neither of the Surveillance Videos is audible.

the group of people congregating around the white vehicle. At 3:30 in Surveillance Video 2, one of the two people turns around towards the person remaining on the southeast corner. Also at 3:30 in Surveillance Video 2, another person enters the top of the video frame, from the middle of the intersection, calmly walking towards the southeast corner where the two people remained. At some point during these few seconds, a dispute arose and shouting ensued. DDUSF, ¶¶ 53-56; Julia Lockett Grand Jury testimony 163:13-16. The altercation escalated and Plaintiff, who was in the middle of the Seaman Street and Remsen Avenue intersection, outside the view of the Surveillance Videos, pulled out what appeared to be a 9-millimeter gun.[5] DDUSF ¶¶ 61-62, 65, 66, 70, 71, 74; O'Connor Certification, Ex. 30, at 3, 4, 5, 6; Plaintiff's Dep. 217:13-14, 222:19-21; Antony Rodriguez Dep. 121:6-19, 122:3-5; Messinia Chiles Grand Jury Testimony 148:1-3. Immediately after pulling out the gun, outside of the view of the Surveillance Videos, Plaintiff fired the gun towards the white vehicle, which was parked directly in front of the unmarked police vehicle.[6] *Id.*;

---

[5] The gun was actually a 9 mm semiautomatic Blow Magnum Blank Gun, which is meant to resemble a 9 mm Beretta model 92F. DDUSF ¶¶ 27, 29. Plaintiff admits that the replica gun looks like a real gun and sounds like a real gun when it is fired. DDUSF ¶ 28. Everything about the gun resembles a real Beretta, except "it does not discharge a projectile." DDUSF ¶ 29; O'Connor Certification, Ex. 29, at 76:1-24 (comparing the blank gun to a real Beretta and noting the exactness of the replica). While imitation firearms ordinarily have a brightly colored plug inserted into the barrel to distinguish them from real weapons, Plaintiff filed off the yellow paint on the replica gun and colored in the tip with black marker. DDUSF ¶¶ 33-34; Plaintiff's Dep. 176:7-19. There is no dispute that Plaintiff's gun looked and sounded real, and Plaintiff conceded as much. DDUSF ¶ 75; Transcript of Plaintiff's Plea Hearing ("Plaintiff's Plea"), at 8:20-24.

[6] The law enforcement officers and one witness claim that Plaintiff fired towards the unmarked police vehicle. *See* DDUSF ¶¶ 67, 78; Weiss Dep. 82:8-19, 83:2-15, 85:10-11; O'Connor Certification, Ex. 30, at 4. It is unclear how many shots Plaintiff fired. *See* DDUSF ¶¶ 62, 69-70; Weiss Dep. 86:1-9, 101:3-5; Deposition Transcript of Detective Andrew Winter ("Winter Dep."), at 35:13-15 (finding only one shell casing from the blank gun); O'Connor Certification, Ex. 29, at 66:16-20 (finding only one discharged nine

O'Connor Certification, Ex. 30, at 5, 6; Plaintiff's Dep. 222:19-21; Antony Rodriguez Dep. 123:7-12; Cathcart Dep. 20:14-18; Herinson Rodriguez Dep. 114:19-23; Julia Lockett Grand Jury testimony 164:12-21, 165:6-7, 167:5-9l; Messinia Chiles Grand Jury Testimony 147:1-9, 150:13-19; Robert Johnson Grand Jury Testimony 17:24-25.

By 3:32 in Surveillance Video 2, the group of people began to quickly disperse, running in different directions and some jumping into the white vehicle. At 3:33 in Surveillance Video 2, Plaintiff enters the top of the video frame, holding a gun. At 3:34, Plaintiff appears to fire the gun upwards in the direction of the white vehicle and the white vehicle begins to leave the scene heading west on Seaman Street towards Lee Ave.

At 3:35 in Surveillance Video 2, Plaintiff begins to run east on Seaman Street towards the unmarked police vehicle, along its driver's side. At the same time, the rear passenger-side door to the police vehicle opens and Officer Bornheimer begins to exit the vehicle, turning clockwise towards the trunk of the vehicle. Less than one second later, at 3:36 in Surveillance Video 2, Officer Suarez opens the front passenger-side door, while Plaintiff continues running next to the police vehicle.

Concurrently, at 2:45 in Surveillance Video 1, Detective Weiss opens the driver's door. Plaintiff enters the video frame of Surveillance Video 1 at 2:46, running next to the driver's door as it is opening. By 2:47 in Surveillance Video 1, Detective Weiss fires three consecutive shots—as he exits the police vehicle, with his gun firing next to the driver's side rear window—at Plaintiff.[7] Before Detective Weiss fires his third shot, Plaintiff is

---

millimeter blank cartridge). *But see* Antony Rodriguez Dep. 121:13-19 (hearing two shots fired); Herinson Rodriguez Dep. 114:19-23; Julia Lockett Grand Jury Testimony 168:5-6.

[7] Detective Weiss described his reaction to Plaintiff as "all happening at once . . . as soon as I could open the door[,] I fired." Weiss Dep. 103:21-22, 104:7-8.

already beginning to fall to the pavement in the middle of Seaman Street. Officer Bornheimer can be seen taking aim at Plaintiff, as he stands next to the rear passenger-side door.

Plaintiff lands face down on the pavement, appearing to have his hands extended out in front of him and lying still on the ground by 2:48 in Surveillance Video 1. Plaintiff's gun can be seen, about 10-15 feet away, tumbling away from Plaintiff to the curb on the south side of Seaman Street, away from the law enforcement officers, in front of a parked SUV with its headlights on and towards an illuminated streetlight—the most well lit part of the street. Plaintiff's feet are nearest to the police vehicle and his body is pointed away, face down on the pavement. Plaintiff is no longer moving. In sum, in less than 3 seconds, Detective Weiss opened his door, fired three shots, and Plaintiff fell face down on the ground without his gun.

By 3:38 in Surveillance Video 2, Officer Suarez finishes exiting the vehicle, drawing his weapon from its holster, and turning clockwise to regain sight of Plaintiff. According to Officer Suarez, by the time he regained sight of Plaintiff and pointed his gun at Plaintiff, "he was already down in the street."[8] Deposition Transcript of Officer Luis Suarez ("Suarez Dep."), at 27:9-10, 28:7.

By 2:48 in Surveillance Video 1, Detective Weiss, who is now out of the vehicle, takes two steps towards Plaintiff—the rear of the vehicle—and begins re-holstering his gun. At this same second, Officer Bornheimer is still aiming his gun at Plaintiff and walking towards the rear of the police vehicle. Around this time, one of the law

---

[8]    Officer Suarez can be seen in Surveillance Video 2, re-holstering his gun and moving out of the video frame at 3:41.

enforcement officers called dispatch to report, "shots fired." O'Connor Certification, Ex. 46. According to Detective Weiss, he was not sure which shot struck Plaintiff, but he knew that at least one shot must have hit Plaintiff, Weiss Dep. 108:20-25, 109:1-6, and he saw Plaintiff's "gun skip and hit the curb." Weiss Dep. 112:1-5.

As Detective Weiss nears the rear of the police vehicle and after re-holstering his gun, at 2:49 in Surveillance Video 1, Officer Bornheimer fires a fourth shot at Plaintiff. Officer Bornheimer can be seen standing directly behind the trunk of the police vehicle when he fires and Plaintiff can be seen lying in the middle of Seaman Street approximately 10 feet in front of Officer Bornheimer, *accord* Bornheimer Dep. 99:20-23, with his face down on the pavement. After being shot for a fourth time, Plaintiff's body jolts. Officer Bornheimer's shot was fired nearly 3 seconds after Detective Weiss had fired his third shot and after Plaintiff had hit the ground.

Immediately thereafter, Detective Weiss can be seen reacting to Bornheimer's gunfire, by ducking and quickly turning back towards the front of the police vehicle.[9] And, Officer Suarez can be seen reaching for his gun that he had already re-holstered. At 2:53 in Surveillance Video 1, Detective Weiss stops moving forward, next to the vehicle's front driver's-side tire, and turns back to look at Officer Bornheimer. In the next second,

---

[9]        In his deposition, Detective Weiss states that he was unaware that Officer Bornheimer fired a shot at Plaintiff until after Officer Bornheimer told him he did so, when the incident had concluded. Weiss Dep. 120:2-19. According to Detective Weiss, he "couldn't really hear," Weiss Dep. 119:1-2, and did not know that "any other shots [were] fired." Weiss Dep. 118:20-22. Officer Suarez, however, initially indicated that he was able to hear Officer Bornheimer fire at Plaintiff. Suarez Dep. 29:2-12. Later in his deposition, though, Officer Suarez stated that he could not hear Officer Bornheimer's shot, nor was he aware, the night of the incident, that Officer Bornheimer had fired his gun at Plaintiff. Suarez Dep. 48:7-28.

Detective Weiss can be seen on his radio calling to report, again, "shots fired." *Accord* O'Connor Certification, Ex. 46.

At 2:55 in Surveillance Video 1, Detective Weiss begins walking toward Plaintiff, while Officer Bornheimer's gun is still drawn and aimed at Plaintiff. Officer Suarez then points a flashlight at Plaintiff and Officer Bornheimer backs up towards the passenger side of the police vehicle. Officer Bornheimer then begins to approach Plaintiff, while Detective Weiss can be seen in the middle of the street on his radio. Officer Bornheimer paces around Plaintiff for 21 seconds, and, while standing over Plaintiff, he turns on his flashlight. Later, Detective Weiss walks back over to Plaintiff, and bends down towards Plaintiff. One of the law enforcement officers walks over to where Plaintiff's gun had come to rest against the curb and looks down at the gun. Finally, after the law enforcement officers continued to pace around and had their backs towards Plaintiff, an officer appears to bend down, for the first time, and pat down Plaintiff for weapons.[10]

## B. Plaintiff's Account

As the altercation near the intersection of Seaman Street and Remsen Avenue ensued, Plaintiff reached into a backpack in the middle of the intersection and claims he pointed the gun straight up into the air and fired two shots. Plaintiff's Dep. 217:13-14,

---

[10]     Officer Gregory Liszczak ("Officer Liszczak") was the first backup officer to arrive on the scene. O'Connor Certification, Ex. 30, at 7 ("Liszczak Statement to Prosecutors"). After asking a few questions of the officers, Officer Liszczak asked whether Officer Bornheimer, Detecitve Weiss, or Officer Suarez had conducted a search of Plaintiff, who was still on the pavement in the middle of Seaman Street. *Id.* The officers stated that they were not sure if Plaintiff had been searched. *Id.* Thereafter, Officer Liszczak gently patted Plaintiff down to search for weapons. *Id.*

222:19-21, 224:20.  According to Plaintiff, he did not fire the gun again after the initial two shots.  Plaintiff's Dep. 231:2-11.

After firing the gun, Plaintiff ran east on Seaman Street in an effort to get away from the "drama" at the intersection.  Plaintiff's Dep. 231:12-17.  As he was running, Plaintiff "felt a shot . . . and [he] dropped" to the pavement.  Plaintiff's Dep. 232:21-24. As he fell to the ground, Plaintiff lost control of the gun, Plaintiff's Dep. 247:19-22; 249: 8-13; 250:8-12, and "felt another shot."  Investigative Interview Transcript of Victor Rodriguez by Scott Crocco ("Crocco Investigative Interview"), at 8:6-7.

Once on the pavement, Plaintiff realized that he was "really, really shot."  Plaintiff's Dep. 233:6-13.  According to Plaintiff, he did not see the police or even see anyone shooting at him until he was on the pavement.  Plaintiff's Dep. 232:1-18, 234:1-8, 237:15-21.  But, once he was on the pavement, Plaintiff could see to his left "a guy pointing a gun at [him]," Plaintiff's Dep. 240:16-17, from approximately "five feet away."  Plaintiff's Dep. 240:20.  As Plaintiff recalls the incident, he "was on the [pavement] for a little bit" of time, Plaintiff's Dep. 242:8, "the gun was long [ ] gone," O'Connor Certification, Ex. 28, Crocco Investigative Interview, at 4:19-20, "and then [he] got shot again."[11]  Plaintiff's Dep. 242:8-9.  In total, Plaintiff recalls hearing "around five" shots other than the two he fired.  Plaintiff's Dep. 236:2-4.

---

[11]     A bystander watching the incident from the corner of Remsen Avenue and Seaman Street described the following: "he was shot once more after he had landed on the ground. . . . after he landed and the gun was [away from him] . . . I know that was wrong . . . by then he was on the ground."  Herinson Rodriguez Dep. 138:24-2, 139:1-7.

### C. Defendant's Account[12]

According to Officer Bornheimer, he saw Plaintiff in front of the police vehicle, on the driver's side, with a gun in his hand, pointing it in the direction of the police vehicle. Bornheimer Dep. 61:2-17. Plaintiff was running towards and along the side of the police vehicle, as he aimed the gun in the direction of the officers.[13] Bornheimer Dep. 62:15-18, 63:10-12. As Plaintiff was next to the police vehicle, according to Officer Bornheimer, Plaintiff straightened out his arm and pointed the gun parallel to the police vehicle and fired.[14] Bornheimer Dep. 70:3-15. Officer Bornheimer saw a muzzle flash of the gun in the rear driver's side window of the police vehicle.[15] Bornheimer Dep. 70:20-25.

After seeing the flash of the gun, Officer Bornheimer believed "he was either trying to kill us or somebody else that was in the area," so he opened the rear passenger side door to get out of the vehicle as quickly as he could. Bornheimer Dep. 73:1-7; Officer Bornheimer Grand Jury Testimony 187:10-12. As he exited the vehicle, Officer Bornheimer drew his gun and turned clockwise—losing sight of Plaintiff for a split-second. Bornheimer Dep. 75:1-11, 85:1-4. By the time he regained sight of Plaintiff, Plaintiff was already falling to the pavement. Bornheimer Dep. 85:5-18, 86:1-6. According to Officer

---

[12]     Much of Defendant's account below is contradicted by the foregoing facts taken from the Surveillance Videos.

[13]     The Surveillance Videos do not show Plaintiff aiming his gun in the direction of the officers while he is running.

[14]     As depicted in Surveillance Video 1, Plaintiff did not fire his gun while he was next to the police vehicle.

[15]     Surveillance Video 1 clearly shows that the muzzle flash seen by Officer Bornheimer through the rear driver's side window was a result of Detective Weiss firing his gun.

Bornheimer, he never saw Detective Weiss open his door or fire his gun, Bornheimer Dep. 68:10-12, 68:16-19, 71:14-19, or heard anything—gunshots or any sounds at all—after the shot that, Bornheimer claims, Plaintiff fired as he passed the driver's side rear window. Bornheimer Dep. 80:7-25, 81:1.

After he was out of the police vehicle, Officer Bornheimer saw Plaintiff falling to the ground. Bornheimer Dep. 69:7-10. At this point, Officer Bornheimer had his gun drawn and aimed at Plaintiff, as he fell. Bornheimer Dep. 85:5-22. According to Officer Bornheimer, he could see Plaintiff's "arms extended" as he fell to the ground, *see* Bornheimer Dep. 88:1, and Plaintiff's gun was still in his hand. Bornheimer Dep. 90:25, 91:1, 91:19. Officer Bornheimer was unsure why Plaintiff fell to the ground and was still experiencing "a ringing noise" from the earlier gunshot from next to the rear driver's side window. Bornheimer Dep. 91:20-24, 103:16-18.

"As soon as he fell on the ground[,] I fired one round at him," Bornheimer testified. Bornheimer Dep. 92:5-6. "As soon as [Plaintiff] hit the ground is when I pulled the trigger."[16] Bornheimer Dep. 100:8-9. According to Officer Bornheimer, he was unsure whether Plaintiff was on his abdomen and stretched out. Bornheimer Dep. 92:7-18. Once Plaintiff had fallen and was on the ground, Officer Bornheimer claims that he could not see Plaintiff's hands or arms, Bornheimer Dep. 92:19-25, 93:1-10, and therefore he "believ[ed] he was still armed and dangerous." Defendant's Answers to Interrogatories, at 7; Officer Bornheimer Grand Jury Testimony 177:4-9 (stating that he shot Plaintiff after he was on the ground because "it looked like . . . he was in a prone position where he was

---

[16]     Surveillance Video 1 shows that Officer Bornheimer waited nearly three seconds from the time Plaintiff hit the ground to the time he fired his gun. During that time, Plaintiff does not appear to move.

trying to make himself a smaller target, which would be harder for myself or other officers to shoot him . . . . And also, when you're on the ground, it's easier to aim and fire with better accuracy"). Thus, according to Officer Bornheimer, when he fired from approximately 10 feet away, Bornheimer Dep. 99:17-23, he "fear[ed] for [his] life and the lives of others." *Id.* As such, Bornheimer did not give Plaintiff any commands before shooting Plaintiff. Officer Bornheimer Grand Jury Testimony 187:5-7.

After he fired, Officer Bornheimer "was still looking for the weapon, [he] still thought that he was armed." Bornheimer Dep. 101:17-18. It was not until "a few seconds" after he fired his gun that Officer Bornheimer learned from Detective Weiss that Plaintiff's gun had skipped across the pavement to the curb. Bornheimer Dep. 102:2-17. At no point after firing his gun, did Officer Bornheimer move Plaintiff or check to see if there was a gun underneath Plaintiff, as he was laying motionless on the pavement on his abdomen, Bornheimer Dep. 104:16-25, 105:1-10; Officer Bornheimer Grand Jury Testimony 178:15-16 (stating that after shooting him, Plaintiff made no more threatening movements), because he was concerned he could "possibly hurt him more." Officer Bornheimer Grand Jury Testimony 187:25.

## D. After the Incident

According to Dr. Georg Nils Herlitz ("Dr. Herlitz"), Chief Resident at Robert Wood Johnson and Plaintiff's treating physician, who spoke with Prosecutors on February 7, 2012 to discuss Plaintiff's injuries, Plaintiff "appeared to have been shot four or five times."[17]

---

[17] During discovery, Defendant's counsel conducted *ex parte* communications with Dr. Herlitz in violation of Plaintiff's authorization that permitted certain records be released, and in violation of Health Insurance Portability and Accountability Act ("HIPAA"). Subsequently, this Court affirmed the Magistrate Judge's decision to disqualify Dr. Herlitz as an expert, strike his report from September 13, 2016, and bar him

O'Connor Certification, Ex. 30, at 15. According to Dr. Herlitz, Plaintiff had one wound to the right armpit, which was likely the cause of significant bleeding in the chest. *Id.* Another wound was located in Plaintiff's back, hitting his ribs. *Id.* A third wound was on Plaintiff's left flank—"this wound is believed to have resulted in a severed spinal cord." *Id.* The bullet from this wound was "lodged in the spinal cord and numerous fragments remain[ed] in [Plaintiff's] body." *Id.* The last wounds were to Plaintiff's legs and suggested that either one shot went through his left leg and entered his right leg or his legs were each struck with separate rounds.[18] *Id.*

Contrary to Dr. Herlitz interview notes, Plaintiff's expert, Paul Ratzker, M.D., "noted that Plaintiff suffered a gunshot wound to his lumbar spine, and that his paraplegic conditions were caused by this wound." *Rodriguez*, 2017 WL 5598217, at *2. Regardless, as a result of this incident, Plaintiff is now a paraplegic.

### E. New Jersey's Use of Force Policy & Standards

Under New Jersey law, "deadly force" means force which the officer uses with the purpose of causing or which the officer knows to create a substantial risk of causing death or serious bodily harm.[19] N.J.S.A. § 2C:3-11. Purposely firing a firearm in the direction of another person constitutes deadly force. *Id.*

---

from testifying at trial. *See Rodriguez, v. The City of New Brunswick*, No. 12-4722, 2017 WL 5598217 (D.N.J. Nov. 21, 2017). But, for the purpose of recounting the facts, the Court refers to Dr. Herlitz's interview with Middlesex County Prosecutors.

[18] The Use of Force Reports filed by Detective Weiss and Officer Bornheimer, indicate that Plaintiff was "hit" with four shots. O'Connor Certification, Ex. 49.

[19] "Serious bodily harm" is defined as bodily harm which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ. N.J.S.A. § 2C:3-11.

Under New Brunswick policy, in using force, officers are under a duty to employ extraordinary care in the handling of firearms and other deadly weapons. New Brunswick Police Department Policy Comment on Use of Deadly Force. Moreover, it is essential that each officer exercise sound judgment and act reasonably under all circumstances where any force is applied. *Id.* Given the existence of the requisite legal conditions, an officer should resort to deadly force only when immediately necessary and only after less drastic alternatives have been exhausted or are reasonably believed to be ineffective in light of the prevailing circumstances. *Id.* Importantly, the reasonableness of the use of force is judged in relation to the harm the officer seeks to prevent. *Id.*

Under the Attorney General's Use of Force Policy, law enforcement officers are required to exercise the utmost restraint in situations where the use of force is justified. O'Connor Certification, Ex. 60, Attorney General's Use of Force Policy. The degree of force employed should only be that which is reasonably necessary. *Id.* Indeed, law enforcement officers should exhaust all other reasonable means before resorting to the use of force. *Id.* And, law enforcement officers must use only the force, which is objectively reasonable and necessary. *Id.* There are three rules involving the use of deadly force under the Attorney General's policy:

1. A law enforcement officer may use deadly force when the officer reasonably believes such action is immediately necessary to protect the officer or another person from imminent danger of death or serious bodily harm.
2. A law enforcement officer may use deadly force to prevent the escape of a fleeing suspect
   a. whom the officer has probable cause to believe has committed an offense in which the suspect cause or attempted to cause death or serious bodily harm; *and*
   b. who will pose an imminent danger of death or serious bodily harm should the escape succeed; *and*

        c. when the use of deadly force presents no substantial risk of injury to innocent persons.

    3. If feasible, a law enforcement officer should identify himself/herself and state his/her intention to shoot before using a firearm.

*Id.*

## PROCEDURAL BACKGROUND

On July 30, 2012, Plaintiff filed a Complaint naming Defendant and the Dismissed Defendants. During Plaintiff's criminal proceedings, on October 16, 2012, Magistrate Judge Bongiovanni issued an Order staying discovery pending the resolution of the Grand Jury Proceedings in the related criminal matter of *State of New Jersey v. Victor Rodriguez*, No. 12-2893.

On November 7, 2012, Plaintiff was indicted on 12 counts: (1) One Count of Possession of Imitation Firearms in the Fourth Degree; and (2) Eleven Counts of Terroristic Threats in the Third Degree. *See* O'Connor Certification, Ex. 54; Ex. 55. Neither Detective Weiss nor Officer Bornheimer was indicted by the Grand Jury for their use of force.

On December 5, 2012, a Letter Order was issued staying discovery and administratively terminating the matter with the right of Plaintiff to move to reopen promptly upon resolution of the related criminal matter of *State of New Jersey v. Victor Rodriguez*. On January 6, 2014, Plaintiff pleaded guilty to unlawful possession of an imitation firearm (Count 1 of the 12 count indictment). *See* Plaintiff's Plea. On April 21, 2014, Plaintiff was sentenced two years probation with special conditions for Unlawful Possession of an Imitation Firearm and the eleven counts of Terroristic Threats were dismissed. *See* O'Connor Certification, Ex. 56.

Thereafter, on April 29, 2014, Magistrate Judge Bongiovanni reopened the matter and lifted the stay following the application made by Plaintiff. On May 8, 2015, Plaintiff

filed his First Amended Complaint. By stipulation, in August of 2016, Defendants County of Middlesex, Middlesex County Sheriff's Department, and Sheriff Mildred S. Scott were dismissed *with prejudice*. On October 4, 2016, the Magistrate Judge stayed the time for the remaining Defendants to file their motions for summary judgment. On October 14, 2016, Plaintiff moved to bar Defendant's expert. By Letter Order, on April 7, 2017, the Magistrate Judge granted Plaintiff's motion. On April 21, 2017, Defendant moved to vacate the Magistrate Judge's Order.

On May 12, 2017, Defendant filed the instant motion for summary judgment. While the instant motion was pending, by stipulation, in June and July of 2017, Defendants Andrew Weiss, Anthony Caputo, the City of New Brunswick, the New Brunswick Police Department, and Mayor James M. Cahill were dismissed *with prejudice*. On November 21, 2017, this Court affirmed the Magistrate Judge's Order, disqualifying Dr. Herlitz as an expert, striking his report on September 13, 2016, and barring him from testifying at trial. *See Rodriguez*, 2017 WL 5598217.

Before the Court is Defendant's motion for summary judgment on the basis that (1) his use of force was objectively reasonable; (2) he is entitled to qualified immunity; and (3) the grand jury's finding of no cause to indict Defendant precludes finding that Defendant used excessive force against Plaintiff. Additionally, Defendant seeks dismissal of Plaintiff's excessive force claim in violation of the New Jersey Civil Rights Act and Plaintiff's claims for punitive damages. Plaintiff opposes the motion.

## LEGAL STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

However, the Supreme Court has instructed that, in qualified immunity cases, the existence of a videotape recording presents an "added wrinkle" to the general standard requiring the court to construe facts in the light most favorable to the non-moving party. *Scott*, 550 U.S. at 378. In that regard, "[w]here there is a video recording of the relevant events, the Court views the facts as depicted in the recording, rather than in the non-movant's favor, whenever the recording 'blatantly contradict[s]' the non-movant's version such that 'no reasonable jury could believe it.'" *Knight v. Walton*, 660 F. App'x 110, 112 (3d Cir. 2016) (alteration original) (quoting *Scott*, 550 U.S. at 380–81). The ability to rely on video evidence is important in the present case, because much of the encounter, including all four bullets fired by the police at Plaintiff, are captured on video.

The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 322. Once the moving party has satisfied this initial burden, the opposing party must identify "specific facts which demonstrate that there exists a genuine issue for trial." *Orson*, 79 F.3d at 1366 (citing *Celotex Corp.*, 477 U.S. at 323); *see Gleason v. Norwest Mortg. Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." (citation omitted)). The non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." *Woloszyn v. County of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005) (quoting *Colburn v. Upper Darby Township*, 946 F.2d 1017, 1020 (3d Cir. 1991)). Not every issue of fact is sufficient to defeat a motion for summary judgment; issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Additionally, the nonmoving party cannot rest upon mere allegations; he or she must present actual evidence that creates a genuine issue of material fact. *See* Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 249. In conducting a review of the facts, the nonmoving party is entitled to all reasonable inferences and the record is construed in the light most favorable to that party. *See Pollock v. American Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). Accordingly, it is not the Court's role to make findings of fact, but to analyze the facts presented and determine if a reasonable jury could return a verdict for the nonmoving party. *See Brooks v. Kyler*, 204 F.3d 102, 105, n.5 (3d Cir. 2000); *Big Apple BMW v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

**DISCUSSION**

## I. Excessive Force Claim Against Officer Bornheimer

In Count Two[20] of the Complaint, Plaintiff alleges that Officer Bornheimer used excessive force, in violation of Plaintiff's Fourth Amendment right, by firing a fourth bullet into Plaintiff's torso to apprehend Plaintiff. The first three bullets fired by Detective Weiss, Plaintiff has conceded were objectively reasonable. Officer Bornheimer moves for summary judgment on Plaintiff's excessive force claim, arguing that he employed a reasonable amount of force, and, even if the force used was not objectively reasonable, he is nonetheless entitled to qualified immunity.

### A. Qualified Immunity Overview

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When properly applied, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). To overcome qualified immunity, a plaintiff must plead facts sufficient to show that: (1) the official violated a statutory or constitutional right; and (2) "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (citation omitted); *Mammaro v. New Jersey Div. of Child Prot. & Permanency*, 814 F.3d 164, 168-69 (3d Cir. 2016) (citation omitted). A right is clearly established if it is "sufficiently clear that every reasonable official would have understood

---

[20] Count One involved the Dismissed Defendants and is not included in the instant motion.

that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation marks and citation omitted). The Court has discretion to approach these steps in the sequential order that it deems "most appropriate for the particular case before [it]." *Santini v. Fuentes*, 795 F.3d 410, 418 (3d Cir. 2015) (citing *Pearson*, 555 U.S. at 236). Finally, the burden of proving the affirmative defense of qualified immunity rests on the party seeking to invoke it. *See Thomas v. Independence Twp.*, 463 F.3d 285, 292 (3d Cir. 2006) (citation omitted); *Hicks v. Feeney*, 850 F.2d 152, 159 (3d Cir. 1988) (citation omitted).

**B. Qualified Immunity — Officer Bornheimer**

***1. Plaintiff's Fourth Amendment Right to be Free from an Unreasonable Seizure***

The first step in the Court's qualified immunity analysis is to identify whether the facts of this case, taken in the light most favorable to Plaintiff, show that Officer Bornheimer violated a specific constitutional right belonging to Plaintiff. *Santini*, 795 F.3d at 417. The Supreme Court has held that all claims alleging excessive force in the context of an arrest, investigatory stop, or seizure must be "analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989); *see Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004). The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV. "To prevail on a Fourth Amendment excessive-force claim, a plaintiff must show that a seizure occurred and that it was unreasonable under the circumstances." *Lamont v. New Jersey*, 637 F.3d 177, 182–83 (3d Cir. 2011) (citations omitted). "As the Supreme Court recognized in *Tennessee v. Garner*, 471 U.S. 1, 7 (1985), 'there can be no question that apprehension by the use of deadly force is a seizure subject

to the reasonableness requirement of the Fourth Amendment.'" *Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir. 1999); *see Curley v. Klem*, 499 F.3d 199, 203 n.4 (3d Cir.2007) ("An officer seizes a person whenever he 'restrains the freedom of a person to walk away[.]' Thus, there is 'no question' that a shooting constitutes a seizure under the Fourth Amendment." (internal citation omitted)). Here, there is no dispute that a seizure occurred when the officers used deadly force to arrest Plaintiff. Thus, the pivotal question for the Court is whether, in light of the circumstances confronting him, Officer Bornheimer employed an unreasonable amount of force when he fired the fourth gun-shot to effectuate Plaintiff's arrest.

"The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). To determine reasonableness in excessive force cases, courts within the Third Circuit ask, "whether under the totality of the circumstances, 'the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them.'" *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004) (quoting *Graham*, 490 U.S. at 397); *see also Santini*, 795 F.3d at 417 ("[W]e employ a 'totality of the circumstances' approach for evaluating objective reasonableness." (citing *Curley*, 499 F.3d at 207)). This assessment requires courts to balance the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotation marks and citation omitted). While the objective reasonableness inquiry "requires careful attention to the facts and circumstances of each particular case," the Supreme Court has provided three general factors to guide the Court's inquiry: (1) "the severity of the crime at issue"; (2) "whether the suspect poses an immediate threat to the

safety of the officers or others"; and (3) whether the suspect "is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citing *Garner*, 471 U.S. at 8-9); *Santini*, 795 F.3d at 417. "Other relevant factors include the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997), *abrogated on other grounds by Stetser v. Jinks*, 572 F. App'x 85 (3d Cir. 2014).

Importantly, while some courts consider "only the facts and circumstances at the precise moment that excessive force is applied," courts within the Third Circuit take into account "all of the relevant facts and circumstances leading up to the time that the officers allegedly used excessive force." *Rivas*, 365 F.3d at 198 (citation omitted). Nevertheless, the Third Circuit recognizes that "[e]ven where an officer is initially justified in using force, he may not continue to use such force after it has become evident that the threat justifying the force has vanished." *Lamont*, 637 F.3d at 184 (citing *Lytle v. Bexar County, Tex.,* 560 F.3d 404, 413 (5th Cir. 2009) (observing that "an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased"); *Waterman v. Batton,* 393 F.3d 471, 481 (4th Cir. 2004) ("[F]orce justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated."); *Abraham,* 183 F.3d at 294 ("A passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect."); *Ellis v. Wynalda,* 999 F.2d 243, 247 (7th Cir. 1993) ("When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with

impunity.")).

The objective reasonableness of a particular use of force is evaluated from "the perspective of the officer at the time of the incident and not with the benefit of hindsight." *Santini*, 795 F.3d at 417 (citation omitted); *see Graham*, 490 U.S. at 396 ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." (citation omitted)). "Deadly force will only be considered reasonable, . . . when 'it is necessary to prevent escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Abraham*, 183 F.3d at 288 (quoting *Garner*, 471 U.S. at 3). Nevertheless, "[w]hether or not [an officer's] actions constituted application of 'deadly force,' all that matters is whether [the officer's] actions were reasonable." *Johnson v. City of Philadelphia*, 837 F.3d 343, 349 (3d Cir. 2016) (alterations original) (quoting *Scott*, 550 U.S. at 383). Thus, within the context of an excessive force claim, the "standard of reasonableness at the moment applies: 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). Rather, the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. Accordingly, to determine whether Officer Bornheimer's use of deadly force was excessive, this Court must "slosh [its] way through the factbound morass of 'reasonableness.'" *Scott*, 550 U.S. at 383.

Notably, "[t]he reasonableness of the use of force is normally an issue for the jury." *Rivas*, 365 F.3d at 198 (citation omitted); *accord Curley*, 499 F.3d at 209-10 ("[A] jury can evaluate objective reasonableness when relevant factual issues are in dispute." (quoting *Curley v. Klem*, 298 F.3d 271, 279 (3d Cir. 2002) (footnote omitted)); *Abraham*, 183 F.3d at 290 ("[S]ince we lack a clearly defined rule for declaring when conduct is unreasonable in a specific context, we rely on the consensus required by a jury decision to help ensure that the ultimate legal judgment of 'reasonableness' is itself reasonable and widely shared."). However, where there is no genuine issue of material fact and the question is "whether an officer made a reasonable mistake of law and is thus entitled to qualified immunity," the question is one "of law that is properly answered by the court, not a jury." *Curley*, 499 F.3d at 211 (citing *Carswell v. Borough of Homestead*, 381 F.3d 235, 242 (3d Cir. 2004)).

In the instant matter, Plaintiff's claim is limited to the fourth gun-shot fired by Officer Bornheimer, once he was already on the ground and no longer possessed the gun. Plaintiff argues that by the time Officer Bornheimer fired at him, the threat he posed earlier with his blank gun had been extinguished for nearly three seconds. Specifically, Plaintiff argues that Officer Bornheimer's use of force was excessive and objectively unreasonable because: (1) Detective Weiss had re-holstered his weapon, concluding that the threat posed by Plaintiff was neutralized; (2) Plaintiff had already been shot three times; (3) Plaintiff had already been lying face down on the ground no longer moving for nearly three seconds; and (4) Plaintiff had already lost control of the gun.

Officer Bornheimer argues that shooting Plaintiff was not an unreasonable use of force, because, based on the totality of the circumstances, it was reasonable for Officer

Bornheimer to believe that Plaintiff was armed and dangerous, and posed an immediate threat to the safety of the public and the other officers. Br. in Supp. of Def's Mot. for Summary Judgment, at 7. Specifically, Officer Bornheimer argues that because Plaintiff was pointing a gun and firing shots on a public street, and because the incident was "tense, uncertain, and rapidly evolving," *see Graham*, 490 U.S. at 397, his use of force was objectively reasonable. Br. in Supp. of Def's Mot. for Summary Judgment, at 7. Moreover, Officer Bornheimer believed that "Plaintiff [had] put himself in a prone position to try to make himself a smaller target to avoid being shot, and to provide himself with a tactical advantage to continue shooting with better accuracy while on the ground." *Id.* at 11. According to Officer Bornheimer, he could not see Plaintiff's weapon or his hands and was unaware that Plaintiff had already been shot three times; therefore, Officer Bornheimer argues that his belief that Plaintiff was armed and dangerous made it reasonable to shoot Plaintiff.

Within the Third Circuit the use of deadly force is not *per se* unreasonable to effectuate an arrest, so long as such use was "necessary to prevent the suspect's escape, and [ ] the suspect posed a significant threat of death or serious physical injury to the officer or others." *Abraham*, 183 F.3d at 289. Unfortunately, however, the Third Circuit has not addressed an excessive force case analogous to the facts in the instant matter,[21] where a plaintiff (1) posed a significant threat to the public with a deadly weapon, then (2) was shot and lost control of the deadly weapon, and then (3) after a pause, was shot again. Accordingly, this Court will look to other Circuits for guidance.

---

[21]    The Court notes that both parties have failed to provide the Court with cases—from the Third Circuit or otherwise—analogous to the instant matter.

In *Fancher v. Barrientos*, the Tenth Circuit was faced with a similar set of facts to this case, providing this Court with some instruction. 732 F.3d 1191 (10th Cir. 2013). In *Fancher*, an officer was investigating a theft and searching for suspects. *Id.* at 1194-95. In so doing, he left his squad car parked and running, as he questioned suspects nearby on foot. *Id.* at 1195. During his questioning of one suspect, someone else threw a beer bottle at him. *Id.* He drew his weapon on three suspects and called to dispatch to apprise them of the ongoing situation. *Id.* He provided verbal commands to the suspects. *Id.* One suspect refused to comply and a struggle ensued. *Id.* at 1196. The suspect grabbed hold of the officer's weapon and it discharged into the ground. *Id.* The suspect ran from the officer and entered the squad car, where other guns were accessible. *Id.* Eventually, the officer fired a single shot at the suspect in his center mass. *Id.* The suspect slumped and the officer was sure that his bullet struck the suspect. *Id.* 1196-97. Nevertheless, at this point the car was moving. *Id.* at 1197. After taking a few steps away from the vehicle, the officer fired a second series of gunshots at the suspect from about 8-10 feet away. *Id.* Between the first round of gunfire and the second round of gunfire, about 5-7 seconds elapsed. *Id.* A total of seven gunshots were fired and the suspect was hit multiple times. *Id.* In the context of excessive force, the issue before the court was whether it was reasonable for the officer to have shot bullets two through seven. *Id.* at 1198. In deciding the qualified immunity question, the court framed its inquiry as whether the officer had "enough time . . . to recognize and react to the changed circumstances and cease firing his gun." *Id.* at 1201. The court concluded that, because the officer fired six more gunshots after the suspect "was 'no longer able to control the vehicle, to escape, or to fire a long gun, and thus, may no longer have presented a danger,'" *id.* at 1201, there is no difficulty

"concluding [the officer] lacked probable cause to believe [the suspect] posed a threat of serious harm to [himself] or others at the time he fired shots two through seven." *Id.*

Another helpful case is *Ayala v. Wolfe*, 546 F. App'x 197 (4th Cir. 2013). In *Ayala*, in the middle of the night, an officer responded to a report of an armed robbery, where the robbers had fled the scene. *Id.* at 199. The officer canvassed the area and found Ayala nearby. *Id.* The officer stopped *Ayala* to frisk him and felt a gun on Ayala's waistband. *Id.* at 199. The officer then backed away and drew his service weapon. *Id.* Without saying anything, Ayala reached for his gun and removed it from his waistband. *Id.* The officer responded by shooting Ayala several times. *Id.* The first shot knocked Ayala's gun to the ground. *Id.* Nevertheless, the officer persisted, continuing to shoot Ayala in the torso until he fell to the ground. *Id.* Ayala lost consciousness during the incident and was subsequently rendered paralyzed. *Id.* According to the officer, after his first shot's flash, he had difficulty seeing and did not see Ayala drop his gun. *Id.* Additionally, the officer "stated that he immediately stopped shooting once Ayala fell to the ground." *Id.* Important to the *Ayala* court's analysis was Ayala's testimony:

> Ayala testified that he had no idea what [the officer] could (or could not) see after the first shot, that he did not know whether his gun made a sound when it fell to the ground, and that he did not tell [the officer]—or otherwise indicate to [the officer]—that he no longer held the gun. . . . In Ayala's words, the time between Wolfe's shots was "really fast."

*Id.* at 199 (internal citation omitted). In addition, "[t]wo witnesses declared that they heard a series of gunshots in the middle of the night, a pause of four or five seconds, and then an additional gunshot." *Id.* However, there was no video of the incident. *See generally id.* Thus, in drawing reasonable inferences in the light most favorable to Ayala, the court essentially adopted Ayala's version of the facts. *Id.* at 199 n.1 (quoting *Scott*, 550 U.S. at

378).  Significantly, however, Ayala "proffered no evidence that [the officer] should have known that he had dropped his gun after the first shot, *i.e.*, that the justification for using deadly force had been 'eliminated' after the first shot." *Id.* at 201.  Additionally, while Ayala argued that the last shot, after a four to five second pause and once he was already on the ground, constituted excessive force, *id.* at 201, Ayala nonetheless admitted that he was unconscious and offered no facts or expert testimony to support his contention.  *Id.* at 202.  Thus, the court concluded that there was *no* evidence to determine whether Ayala still constituted a threat at the time of the last gunshot and therefore the court held that the officer's use of deadly force was not excessive.  *Id.*

Next, in *Lytle v. Bexar Cnty, Texas*, 560 F.3d 404 (5th Cir. 2009), an officer responded to a report of an individual making threats against a female.  *Id.* at 407.  The individual making the threats was in a stolen vehicle and on bond for, among other charges, unlawfully carrying a weapon.  *Id.*  The officer spotted the stolen vehicle, and engaged in a car chase until the vehicle crashed.  *Id.*  After a pause, from about 12-15 feet away, while the stolen vehicle was backing up and trying to flee again, the officer fired two shots.  *Id.* at 407-08.  One shot killed Heather Lytle, the female in the backseat of the stolen vehicle. *Id.* at 408.  Her estate brought claims against the officer, including a Fourth Amendment excessive force claim.  *Id.*  The officer claimed qualified immunity as a defense.  *Id.*  In its reasonableness analysis, the *Lytle* court explained that, although the officer was shooting at an individual driving a car recklessly who potentially possessed a gun, *id.* at 409, there were two primary reasons his conduct was objectively unreasonable: (1) there were no bystanders in the path of the stolen vehicle, *id.*; and (2) under the plaintiff's version of the facts, there was no "threat of immediate and severe physical harm" to the officer.  *Id.*, at

412. Therefore, the court held "a jury could conclude that any *immediate* threat to [the officer] had ceased," *id.*, at 413 (emphasis added), and a jury could "determine [the officer] acted unreasonably in firing at the back of the [stolen vehicle] and thus violated Heather Lytle's constitutional rights." *Id.* at 417.

Another instructive case is *Mullins v. Cyranek*, 805 F.3d 760 (6th Cir. 2015). In *Mullins*, the Sixth Circuit considered whether an officer used excessive force in shooting at a man seconds after he had released his gun. *Id.* at 763-64. There, the officer grabbed the man "to prevent [him] from pulling out a gun, fighting him, or running away." *Id.* at 763. The man resisted and a struggle ensued for more than a minute. *Id.* at 763, 766. During the struggle, the man had a gun in his hand. *Id.* at 763. At some point, the man threw the gun away. *Id.* at 764. The officer fired gunshots at the man, either as he threw the gun or in the seconds after he threw the gun. *Id.* The only evidence of when the shots were fired is a video of the incident, which showed the first shell casing flying across the screen three seconds after the man threw the gun, and then, two seconds later, another shell casing flies across the screen. *Id.* The Sixth Circuit focused its analysis on the reasonableness of the officer's use of deadly force. *Id.* at 766. The officer conceded, "that he shot [the man] only after [the man] threw his gun, but he maintain[ed] that the confrontation unfolded in such rapid succession that he did not have a chance to realize that a potentially dangerous situation had evolved into a safe one." *Id.* Important to the court's analysis was the fact that the incident transpired in a crowded public square with "shops, restaurants, hotels, and offices" in the area. *Id.* at 767. Thus, the Sixth Circuit concluded that the officer "was faced with a rapidly escalating situation, and his decision

to use deadly force in the face of a severe threat to himself and the public was reasonable." *Id.*

Put more simply, the holdings of *Fancher*, *Ayala*, *Lytle*, and *Mullins* paint a clear picture of when cause exists for an officer to use deadly force in response to a significant threat of death or serious physical injury to the officer or others: the officer's use of deadly force *must* be in response to an *imminent* threat to himself, other officers, or the public. Of course, "[a]n officer is not constitutionally required to wait until he sets eyes upon a weapon before employing deadly force to protect himself against a fleeing suspect who moves as though to draw a gun." *Lamont*, 637 F.3d at 186 (internal alterations and citations omitted). Indeed, "[w]aiting in such circumstances could well prove fatal [and] officers do not enter into a suicide pact when they take an oath to uphold the Constitution." *Id.* (citations omitted). However, an officer must recognize when an initial threat is neutralized and his probable cause to use deadly force from a moment before no longer exists. *See Lamont*, 637 F.3d at 184; *Lytle*, 560 F.3d at 413 (observing that "an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased"); *Waterman*, 393 F.3d at 481 ("[F]orce justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated."); *Abraham*, 183 F.3d at 294 ("A passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect."); *Ellis*, 999 F.2d at 247 ("When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity.").

Here, the Court must rely on the Surveillance Videos as the best evidence of what actually occurred on the evening of January 31, 2012. *See Scott*, 550 U.S. at 380–81. To

the extent that there are facts not clearly depicted in the Surveillance Videos, on a summary judgment motion, the Court is required to draw all inferences in favor of the nonmoving party. *See id.*; *Knight*, 660 F. App'x at 112. In so doing, the Court must not make credibility determinations, but when a party's depiction of the events is blatantly contradicted by video evidence of what occurred, the Court must rely on the video. *See Scott*, 550 U.S. at 380–81. Thus, at the outset, I note that, contrary to Defendant's version of the facts, Plaintiff did not fire his gun when he was directly next to the unmarked police vehicle. Bornheimer Dep. 70:3-15, 70:20-25. Moreover, Defendant did not fire his gun at Plaintiff immediately after he fell to the ground, as Defendant has testified. Bornheimer Dep. 92:5-6, 100:8-9.

To begin, the Court views Plaintiff's claim through the lens of the *Graham* test to determine whether a reasonable jury could conclude that it was not objectively reasonable for Officer Bornheimer to fire the fourth gunshot to apprehend Plaintiff, where, at the time he fired, Plaintiff was already shot three times, had lost control of the gun, and was lying motionless and face down in the prone position, outnumbered three to one by the officers. Applying the *Graham* factors, the Court finds that a reasonable jury could conclude that Officer Borneheimer's gunshot was not "objectively reasonable" under the circumstances.[22]

---

[22] In finding that a reasonable jury could conclude that Officer Bornheimer's use of deadly force was unreasonable, the Court does not make a finding of fact that Officer Bornheimer acted unreasonably, or that police officers are not permitted to use deadly force to apprehend a suspect. Rather, the Court finds that because a genuine issue of material fact exists, a jury could conclude that Officer Bornheimer's use of deadly force was not objectively reasonable. Indeed, issues such as whether Officer Bornherim could see Plaintiff's hands or that Plaintiff had lost control of his gun, may be probative in determining the reasonableness of Officer Bornheimer's use of deadly force; the ultimate decision regarding whether Officer Bornheimer violated Plaintiff's constitutional rights by

First, in turning to the severity of the crime factor, Plaintiff possessed and fired a "blank gun" that everyone at the scene of the incident thought was real, although it could not discharge a projectile. Indeed, Plaintiff pleaded guilty to unlawful possession of an imitation firearm. Although, the gun was a fake, it was reasonable for the law enforcement officer to treat such a fake gun as a real gun in this case. Accordingly, even viewing the evidence in the light most favorable to Plaintiff, a reasonable jury is likely to conclude that firing a gun, albeit blank shots, in a threatening manner weighs against Plaintiff and supports Officer Bornheimer's use of force.

Next, by firing a gun in a threatening manner, Plaintiff obviously *initially* "pose[d] an immediate threat to the safety of the officers." *Graham*, 490 U.S. at 396. However, when Plaintiff was already shot and lying on the ground motionless, under the facts favorable to Plaintiff, this *immediate* threat may no longer have existed. As it appeared in the Surveillance Video, "enough time [elapsed for Officer Bornheimer] to recognize and react to the changed circumstances." *Fancher*, 732 F.3d at 1201. In fact, before Officer Bornheimer fired, Plaintiff had lost control of his gun and was face down on the ground for nearly three seconds; Officer Bornheimer may have "ha[d] a chance to realize that a potentially dangerous situation had evolved into a safe one." *Mullins*, 805 F.3d at 766. Thus, under these circumstances, a reasonable jury could conclude that Plaintiff did not pose an imminent threat to the officers or the public, and therefore, the second *Graham* factor tips in Plaintiff's favor.

---

using excessive force is left to the factfinder.

The third *Graham* factor similarly weighs in favor of Plaintiff.  While Plaintiff *initially* was "attempting to evade arrest by flight," *see Graham*, at 396, by the time Officer Bornheimer fired, Plaintiff had been motionless on the ground for nearly three seconds. Therefore, a reasonable jury could conclude that the final *Graham* factor weighs in Plaintiff's favor, and thus, that Officer Bornheimer's use of deadly force was not objectively reasonable.

Taken together, a reasonable jury could also conclude that the additional factors— "the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time," *Sharrar*, 128 F.3d at 822—tip in Plaintiff's favor.  Initially, Plaintiff appeared dangerous, but once on the ground that danger was eliminated as Plaintiff lost control of his gun and stopped moving.  In addition, there were three officers with their guns aimed at Plaintiff as he was laying motionless face down on the pavement.  This incident did not occur in a crowded public square, like in *Mullins*, rather, it unfolded near a street corner and most onlookers had fled—the few nearby witnesses were far enough away that none were captured in the Surveillance Videos during the shooting.  Indeed, there is no testimony from the law enforcement officers that Plaintiff posed a threat to any bystanders.  Ultimately, under the facts favorable to Plaintiff, the circumstances from the time Detective Weiss fired his first shot changed by the time Officer Bornheimer fired the fourth shot; indeed, Detective Weiss re-holstered his gun and appears to already have been on the radio with dispatch to report the incident.

Additionally, under Defendant's version of the facts, Officer Bornheimer could not see (1) Plaintiff's hands or (2) if Plaintiff still had his gun. Bornheimer Dep. 92:7-25, 93:1-10; Defendant's Answers to Interrogatories, at 7; Officer Bornheimer Grand Jury Testimony 177:4-9. Neither assertion is supported by the video, but the Court cannot determine what Officer Bornheimer actually saw. [23] *Marino*, 358 F.3d at 247 ("In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" (quoting *Anderson*, 477 U.S. at 255)). Thus, "since [the law] lack[s] a clearly defined rule for declaring when conduct is unreasonable in a specific context, [the Court is best served by] rely[ing] on the consensus required by a jury decision to help ensure that the ultimate legal judgment of 'reasonableness' is itself reasonable and widely shared." *Abraham*, 183 F.3d at 290. Accordingly, these are triable issues of fact that must be found by a jury and are material to the Court's reasonableness determination.

Moreover, the Court notes that this case differs from the situation in *Ayala*. 546 F. App'x 197. The *Ayala* court held that the officer's use of deadly force was not excessive because Ayala "proffered *no* evidence that [the officer] should have known that he had dropped his gun after the first shot, *i.e.*, that the justification for using deadly force had been 'eliminated' after the first shot." *Id.* at 201 (emphasis added). Unlike in *Ayala*, here, there is video evidence that shows Plaintiff losing control of his weapon and it skipping

---

[23]     In Surveillance Video 1, it appears that Plaintiff's hands were extended in front of him; however, Officer Suarez testified that Plaintiff's "hands were tucked under his body." Suarez Dep. 32:13-14. And, Surveillance Video 1 clearly depicts Plaintiff's gun skipping to the curb seconds before Officer Bornheimer fired his gun.

across the pavement in the preceding seconds before Officer Bornheimer fired his gun. Moreover, the officer in *Ayala* claimed he could not see because of the gun's muzzle flash. Here, Officer Bornheimer had no issue seeing Plaintiff fall to the ground and lying motionless. Rather, he claims he could not hear any other gunshots and could not see Plaintiff's hands once he was face down on the ground. While the Surveillance Video shows that the "justification for the initial force ha[d] been eliminated," *Waterman*, 393 F.3d at 481 (citing *Abraham*, 183 F.3d at 294), by the time Officer Bornheimer fired at Plaintiff, whether Officer Bornheimer could see Plaintiff's hands and gun skip away greatly impacts the question whether Officer Bornheimer's mistake was reasonable.[24] Thus, as discussed above, the Surveillance Videos and Officer Bornheimer's account create a dispute of fact for a jury.

Even if Officer Bornheimer reasonably could have believed that Plaintiff posed a continuing threat of serious physical harm, his failure to command Plaintiff to show his hands or provide some warning before shooting Plaintiff a fourth time, creates an additional impediment to the reasonableness of the use of deadly force. *Hensley v. Price*, --- F.3d ----, ----, 2017 WL 5711029, at *7 (4th Cir. Nov. 17, 2017). Over the course of the nearly three seconds between Plaintiff falling to the ground, Officer Bornheimer *could* have stated, "hands where I can see them," as officers so often do before applying deadly force. *See*, *e.g.*, *C.V. by & through Villegas v. City of Anaheim*, 823 F.3d 1252, 1254 (9th

---

[24] As discussed *infra*, the second step in the qualified immunity analysis is "to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Saucier v. Katz*, 533 U.S. 194, 205 (2001). Specifically, the second step in the immunity analysis "addresses whether, if there was a wrong, such as the use of excessive force, the officer made a reasonable mistake about the legal constraints on his actions and should therefore be protected against suit." *Curley*, 499 F.3d at 207.

Cir.), *cert. denied sub nom. Bennallack v. C. V.*, 137 S. Ct. 570 (2016) (commanding a suspect to "show me your hands" or "put your hands up"); *Perez v. Suszczynski*, 809 F.3d 1213, 1217 (11th Cir. 2016) (warning suspects to get down and put their hands in the air); *Terebesi v. Torreso*, 764 F.3d 217, 226 (2d Cir. 2014) (shouting "Police! Police with warrant! Hands up!"); *McKenney v. Harrison*, 635 F.3d 354, 357 (8th Cir. 2011) (warning a suspect "not to try anything and [saying] 'you don't want to be [shot]'"); *McCullough v. Antolini*, 559 F.3d 1201, 1203 (11th Cir. 2009) (directing a suspect to show his hands); *Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 381 (5th Cir. 2009) (yelling "[l]et me see your hands"); *Wilson v. Meeks*, 52 F.3d 1547, 1553-54 (10th Cir. 1995), *abrogated on other grounds by Saucier*, 533 U.S. at 205 (ordering the suspect to show his hands before shooting him); *Slattery v. Rizzo*, 939 F.2d 213, 215 (4th Cir. 1991) (shooting a suspect who ignored commands to show his hands); *accord* Attorney General's Use of Force Policy; New Brunswick Police Department Policy Comment on Use of Deadly Force. As the Supreme Court explained, "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, *and if, where feasible, some warning has been given*." *Garner*, 471 U.S. at 11–12 (emphasis added).

In sum, under the circumstances alleged by Plaintiff, a reasonable jury could conclude that Officer Bornheimer violated Plaintiff's Fourth Amendment right to be free from excessive force by shooting Plaintiff a fourth time to apprehend Plaintiff. Because a reasonable jury could conclude that Officer Bornheimer's use of force was not "objectively

reasonable" under these circumstances, Defendant, on this motion, has failed to satisfy the first step of the qualified immunity analysis.

### 2. *Clearly Established Right*

Having determined that a reasonable jury could conclude that Officer Bornheimer's conduct was not "objectively reasonable," the Court turns to whether it was clearly established that shooting Plaintiff under the circumstances in this case, violated the Fourth Amendment. In that regard, at the second step of its qualified immunity analysis, the Court must "identify the right at issue and determine if that right was clearly established at the time of the officer's action." *Estep v. Mackey*, 639 F. App'x 870, 873 (3d Cir. 2016). "Qualified immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Luna*, 136 S. Ct. at 308). A right is clearly established where, at the time of the challenged conduct, the contours of the right are "sufficiently clear 'that every reasonable official would [have understood] that what he is doing violates that right.'" *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (alteration original) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). In other words, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.[25]

---

[25] Like the reasonableness inquiry conducted in step one of the qualified immunity analysis, the step two reasonableness inquiry is "objective and fact specific." *Santini*, 795 F.3d at 417. Nonetheless, the step two analysis is distinct from step one, because the purpose of the step two inquiry is "to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Saucier*, 533 U.S. at 205. Stated differently:

While a case directly on point is not required,[26] "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. Stated differently, "there must be sufficient precedent at the time of action, factually similar to the plaintiff's allegations, to put defendant on notice that his or her conduct is constitutionally prohibited." *McLaughlin v. Watson*, 271 F.3d 566, 572 (3d Cir. 2001). "Such precedent must come either from the Supreme Court or a 'robust consensus of cases of persuasive authority in the Court of Appeals.'" *In Re: J & S Properties, LLC*, No. 16-3366, 2017 WL 4294065, at *4 (3d Cir. Sept. 28, 2017) (quoting *Mammaro*, 814 F.3d 169).

In determining whether a constitutional right has been clearly established, the Court must "define the right allegedly violated at the appropriate level of specificity." *Sharp*, 669 F.3d at 159 (citation omitted). Both the Supreme Court and the Third Circuit have repeatedly instructed courts "not to define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742 (citations omitted); *see Pauly*, 137 S. Ct. at 551–52 ("Today, it is again necessary to reiterate the longstanding principle that 'clearly

---

> [T]he first step of the analysis addresses whether the force used by the officer was excessive, and therefore violative of the plaintiff's constitutional rights, or whether it was reasonable in light of the facts and circumstances available to the officer at the time. This is not a question of immunity at all, but is instead the underlying question of whether there is even a wrong to be addressed in an analysis of immunity. The second step is the immunity analysis and addresses whether, if there was a wrong, such as the use of excessive force, the officer made a reasonable mistake about the legal constraints on his actions and should therefore be protected against suit.

*Curley*, 499 F.3d at 207.

[26]     Indeed, "[i]n some cases, even though there may be no previous precedent directly on point, an action can still violate a clearly established right where a general constitutional rule already identified in the decisional law applies with obvious clarity." *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012) (citation omitted).

established law' should not be defined 'at a high level of generality.'" (citation omitted));

*Mackey*, 639 F. App'x at 873. "Rather, the right at issue must be framed 'in a more particularized, and hence more relevant, sense, in light of the case's specific context, not as a broad general proposition.'" *Mackey*, 639 F. App'x at 873 (quoting *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 638 (3d Cir. 2015)). Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).

Indeed, within the context of excessive force claims specifically, both the Supreme Court and Third Circuit have emphasized the importance of defining with particularity the clearly established law. *See Pauly*, 137 S. Ct. at 552; *Santini*, 795 F.3d at 417 (observing that the qualified immunity analysis "has more particularized requirements in an excessive force case"); *Mackey*, 639 F. App'x at 873 (remanding case to the lower court to more specifically identify the right at issue, because the court's formulation of the right "as the Fourth Amendment right to be free from the excessive use of force . . . lack[ed] the required level of specificity and [did] not address the question that needs to be answered in this context because it does not describe the specific situation that the officers confronted"). In *Pauly*, for example, the Supreme Court reversed a denial of qualified immunity, finding that the court below erred in defining the clearly established law pertaining to the plaintiff's excessive force claim at too high a level of generality. *See* 137 S. Ct. at 552-53. In that case, the defendant-officer responded to the plaintiff-suspect's home after a report that the suspect had been involved in a road rage incident earlier that evening. *See id.* at 549. Upon arrival, the officer heard the suspect emerge from his home yelling that he had a gun. *See*

*id.* The officer took cover behind a stone wall, and, after hearing shotgun blasts and seeing the suspect point a handgun in his direction, shot and killed the suspect. *See id.* at 549-50.

In finding that officer violated clearly established law regarding the use of excessive force, by failing to warn the suspect to drop his weapon prior to using deadly force, the Tenth Circuit Court of Appeals relied solely on the general tests for excessive force set forth in *Graham* and *Garner. See id.* at 551. The Supreme Court reversed, finding that the officer did "not violate clearly established law." *Id.* at 552. In so holding, the Court explained that, outside of an "obvious" excessive force case, "*Garner* and *Graham* do not by themselves create clearly established law." *Id.* Because there was not an obvious excessive force violation in that case, the Court found that the Court of Appeals misapplied the "clearly established" analysis by failing to identify "a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *Id*.

Here, the Court is mindful of defining the clearly established right with the appropriate level of specificity and takes into consideration the totality of the circumstances facing the law enforcement officers in this case; thus, I define the clearly established right as the following: it is clearly established that Plaintiff has the right to be free from having deadly force applied to him, even after he fired a gun and threatened the safety of both the public and the officers, so long as the threat he posed was no longer imminent and he was not evading arrest. As I point out below, because there are questions of fact in this regard, granting qualified immunity at Step 2 of the analysis is premature.

Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). In recognition of that principle, the Supreme Court has emphasized that, whenever possible, courts should rule on qualified

immunity "early in the proceedings so that the costs and expenses of trial are avoided." *Saucier*, 533 U.S. at 200; *see Curley v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002) ("[T]he Supreme Court has repeatedly stressed the importance of resolving immunity questions at the earliest possible stages of litigation." (citations omitted)). Nonetheless, the Third Circuit has recognized that "the imperative to decide qualified immunity issues early in the litigation is in tension with the reality that factual disputes often need to be resolved before determining whether the defendant's conduct violated a clearly established constitutional right." *Curley*, 298 F.3d at 278 (citation omitted); *see Santini*, 795 F.3d at 420. Thus, "a decision on qualified immunity [is] premature when there are unresolved disputes of historical fact relevant to the immunity analysis." *Curley*, 298 F.3d at 278.

Based on the Third Circuit's caution, the Court finds that because a material dispute of fact exists in this case regarding whether Officer Bornheimer could see Plaintiff's hands, when prone on the ground, or could see Plaintiff's gun skip across the pavement, an ultimate decision on qualified immunity would be premature at this juncture. *See Curley*, 298 F.3d at 278. Specifically, while Officer Bornheimer testified that he could see Plaintiff's arms were extended as he fell to the ground and he could see that Plaintiff still had the gun in his hand as he fell, Bornheimer Dep. 88:1, 90:25, 91:1, 91:19, once Plaintiff had fallen and was on the ground, Officer Bornheimer claims that he no longer could see Plaintiff's hands or arms and therefore believed he was still armed and dangerous. Bornheimer Dep. 92:19-25, 93:1-10, Defendant's Answers to Interrogatories, at 7; Officer Bornheimer Grand Jury Testimony 177:4-9. However, Officer Bornheimer also testified that when he fired, he was unsure if Plaintiff was alive and stated that he could not see a gun in Plaintiff's hands. Bornheimer Dep. 94:6-22. Nevertheless, Officer Suarez testified

that Plaintiff's "hands were tucked under his body." Suarez Dep. 32:13-14. But, when Officer Suarez was asked why he did not fire at Plaintiff (after he had a clear line of fire), he explained that he did not use his gun because Plaintiff was lying in the street face down and no longer shooting. Suarez Dep. 32:10-24. According to the Surveillance Videos, it appears that Plaintiff's hands were extended once Plaintiff was on the ground. *See* Surveillance Video 1, at 2:47-2:50. Indeed, in recounting the incident to the Middlesex County Prosecutor's Office on February 1, 2012, Plaintiff stated that his gun "was long [ ] gone," O'Connor Certification, Ex. 28, Crocco Investigative Interview, at 4:19-20, before he was shot again. Plaintiff's Dep. 242:8-9. Thus, under Plaintiff's version of the facts, any threat he posed initially was eliminated before he was shot for the fourth time. Because Plaintiff's version of disputed facts may, along with the Surveillance Videos, permit a reasonable jury to decide against Officer Bornheimer, it is too early to conclude whether Officer Bornheimer is entitled to qualified immunity. "These disputed factual issues are thus material as to whether [Officer Bornheimer] is entitled to qualified immunity." *Lytle*, 560 F.3d at 418.

Simply put, under the circumstances depicted by Officer Bornheimer, shooting Plaintiff may have been a reasonable mistake for which his conduct would not be clearly established as excessive force. *See Santini*, 795 F.3d at 418 ("*Saucier* highlighted . . . that the purpose of the step two inquiry is to acknowledge the reality that 'reasonable mistakes can be made as to the legal constraints on particular police conduct.'" (quoting *Curley*, 499 F.3d at 207 (quoting *Saucier*, 533 U.S. at 205)); *Mullins*, 805 F.3d at 769 ("Although [the officer] was ultimately mistaken about the continuing nature of the risk involved, his mistake was a reasonable one under the circumstances, and 42 U.S.C. § 1983 does not

purport to redress injuries resulting from reasonable mistakes."); *Thomas v. Durastanti*, 607 F.3d 655, 666 (10th Cir. 2010) ("Although [the officer's] reasonable perceptions are what matters, he had mere seconds to react, and his actions in firing the first couple of shots were reasonable, even if mistaken. An officer may be found to have acted reasonably even if he has a mistaken belief as to the facts establishing the existence of exigent circumstances." (citing *Pearson*, 129 S.Ct. at 815; *Saucier*, 533 U.S. at 206–07)); *Lytle*, 560 F.3d at 410 ("Qualified immunity allows for officers to make reasonable mistakes about whether their conduct violates the law, and an officer's mistake is reasonable when there are insufficient indicia that the conduct in question was illegal." (citing *Freeman v. Gore*, 483 F.3d 404, 415 (5th Cir. 2007)). Thus, Officer Bornheimer's mistake would have been reasonable, if he perceived Plaintiff posed an imminent threat due to his mistaken belief that Plaintiff still possessed his gun and was preparing to use it.

If, however, the factfinder concludes that Officer Bornheimer did in fact see Plaintiff's hands extended while lying on the pavement, and that he no longer held the gun, or that he saw the gun skip away across the street, then it would have been unreasonable for Officer Bornheimer to use deadly force if Plaintiff no longer posed an imminent threat. *See Lamont*, 637 F.3d at 185. Indeed, if a jury were to make this finding, "[i]t has long been the law that an officer may not use deadly force against a suspect unless the officer reasonably believes that the suspect poses a threat of serious bodily injury to the officer or others." *Id.* (citing *Garner*, 471 U.S. at 3, 11; *Abraham*, 183 F.3d at 294).

Thus, the Court must submit this dispute to the jury before rendering a final decision on whether Officer Bornheimer's conduct constituted a reasonable mistake of law to which he would be entitled to qualified immunity. *See Curley*, 499 F.3d at 211; *Carswell*, 381

F.3d at 242; *Morrison v. Phillips*, No. 06–812, 2008 WL 4308215, at *11 (D.N.J. Sep. 16, 2008) (finding a genuine issue of fact as to whether arresting officers employed excessive force and that "[o]nce the jury resolves [the factual questions regarding the constitutional violation], the Court will be in a position to determine whether [the defendants] made a reasonable mistake of law and are entitled to qualified immunity" (citation omitted)).  In that regard, Officer Bornheimer may renew the qualified immunity defense at trial.  *See Sharp*, 669 F.3d at 158 ("A party may raise qualified immunity as a defense at trial, especially where the facts are not clear." (citation omitted)).

## II.      The Grand Jury's Finding of No Cause to Indict Defendant is Irrelevant

Next, Defendant argues that since he was not indicted criminally for his use of deadly force against Plaintiff, he therefore cannot be found to have used excessive force. To do so, Defendant contends, would invalidate the grand jury's determination.  This argument is wholly misplaced.

In making this argument, Defendant relies on *Heck v. Humphrey*, 512 U.S. 477 (1994).  In *Heck*, the Court held that "a § 1983 plaintiff must prove that [his] conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254," *Heck*, 512 U.S. at 486-87, in order to recover damages for [an] allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid." *Id.* at 486.  The reasoning in *Heck* is inapplicable to the instant matter.  Indeed, determining that Officer Bornheimer's conduct violated Plaintiff's

Fourth Amendment rights has no impact on the fact that Plaintiff pleaded guilty to unlawful possession of an imitation firearm.  More importantly, *Heck* does not apply to a grand jury's determinations.  Thus, Defendant's reliance on *Heck*, here, is erroneous.

In fact, in *Lamont*, the plaintiff filed suit asserting Fourth Amendment excessive force claims against multiple law enforcement officers.  *Lamont*, 637 F.3d at 181.  "[T]he case was stayed pending the outcome of a grand jury investigation into the [officers'] conduct."  *Id.*  Subsequently, the grand jury "declined to indict the troopers, and the case was resumed."  *Id.*  Thereafter, the law enforcement officers "moved for summary judgment, asserting the defense of qualified immunity."  *Id.*  The Third Circuit determined "that a jury could find that the [law enforcement officers'] use of force reached excessive proportions."  *Id.* at 185.  The Third Circuit proceeded to the qualified immunity question and decided that "the evidence would permit the conclusion that the [law enforcement officers] continued firing at [the plaintiff,] after a reasonable officer would have realized that he did not pose a serious threat and stopped shooting," was clearly established.  Accordingly, the Third Circuit held that "the troopers clearly are not entitled to qualified immunity."  *Id.*  No part of the Third Circuit's reasoning had anything to do with the grand jury's decision not to indict the officers.  *Id.*; *see also Salvato v. Miley*, 790 F.3d 1286, 1293 (11th Cir. 2015) (ruling that, despite the fact that the officer was not indicted, the officer is not entitled to qualified immunity with respect to her alleged use of excessive force); *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) (ruling that officers were entitled to qualified immunity due to the serious threat posed to their safety and basing *no part* of its decision on the fact that the grand jury chose *not* to indict the officers).

Similar to the officers in *Lamont*, Officer Bornheimer was not indicted. Nevertheless, in *Lamont*, the Third Circuit found that the officers still employed excessive force notwithstanding a decision not to indict. Here, this Court finds that a genuine issue of material fact exists as to whether Officer Bornheimer violated Plaintiff's Fourth Amendment rights, notwithstanding the fact that Officer Bornheimer was not indicted by a grand jury.

### III. New Jersey Civil Rights Act Claim

In Count Four of the Complaint, [27] Plaintiff asserts claims against Officer Bornheimer under the New Jersey Civil Rights Act ("NJCRA"), N.J.S.A. 10:6-1 *et seq.*, that mirror his constitutional claims; *i.e.*, that Officer Bornheimer used excessive force by shooting Plaintiff for a fourth time. Although Plaintiff has omitted any references to the NJCRA from his brief in opposition to Defendant's motion for summary judgment, the Court assumes this is because courts in New Jersey view the NJCRA as analogous to § 1983, *see*, *e.g.*, *Hedges v. Musco*, 204 F.3d 109, 121 n.12 (3d Cir. 2000); *Van Tassel v. Ocean Cty.*, No. 16-4761, 2017 WL 5565208, at *6 (D.N.J. Nov. 17, 2017); *Velez v. Fuentes*, No. 15-6939, 2016 WL 4107689, at *5 (D.N.J. July 29, 2016); *Hottenstein v. City of Sea Isle City*, 977 F. Supp. 2d 353, 365 (D.N.J. 2013); *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443 (D.N.J. 2011), and therefore assumes this claim has not been waived.

---

[27] Count Three asserted claims under the New Jersey Civil Rights Act against the Dismissed Defendants.

Accordingly, Plaintiff's NJCRA[28] claims will be interpreted analogously to his §

1983 claims.  *Trafton*, 799 F. Supp. 2d at 443–44; *see Hedges*, 204 F.3d at 121 n.12

(concluding New Jersey's constitutional provisions concerning search and seizures are

interpreted analogously to the Fourth Amendment).  Because the Court has found that a

reasonable jury could conclude that Officer Bornheimer's use of force was not "objectively

reasonable," the Court will not enter summary judgment in favor of Officer Bornheimer on

Plaintiff's NJCRA claim.

**IV.    Punitive Damages**

In addition to Plaintiff's requests for compensatory damages and attorneys' fees

and costs, Plaintiff also seeks punitive damages.  The decision to award punitive damages,

however, is generally a jury question.  *See Newport v. Fact Concerts, Inc.*, 453 U.S. 247,

269–70 (1981).  "Malicious intent is not a prerequisite for the award of punitive damages

under § 1983."  *Rand v. New Jersey*, No. 12-2137, 2015 WL 1116310, at *16 (D.N.J. Mar.

11, 2015) (citing *Smith*, 461 U.S. 30, 51 (1983)).  Rather, "a jury may be permitted to assess

punitive damages in an action under § 1983 when the defendant's conduct . . . involves

reckless or callous indifference to the federally protected rights of others."  *Smith*, 461 U.S.

---

[28]      The NJCRA "creates a private cause of action for violations of civil rights secured
under the New Jersey Constitutions."  *Trafton*, 799 F. Supp. 2d at 443 (citation omitted).
Specifically, it provides, in pertinent part, a private cause of action to:

> Any person who has been deprived of any substantive due process or equal
> protection rights, privileges or immunities secured by the Constitution or
> laws of the United States, or any substantive rights, privileges or immunities
> secured by the Constitution or laws of this State, or whose exercise or
> enjoyment of those substantive rights, privileges or immunities has been
> interfered with or attempted to be interfered with, by threats, intimidation
> or coercion by a person acting under color of law.

N.J.S.A. 10:6-2(c).

56; *see also Springer v. Henry*, 435 F.3d 268, 281 (3d Cir. 2006) (holding that a jury may award punitive damages where the defendant's conduct violating plaintiff's constitutional rights is reckless or callous). Thus, dismissal of the claim for punitive damages at this juncture would be premature.

## CONCLUSION

For the foregoing reasons, Officer Bornheimer's Motion for Summary Judgment is

**DENIED**.


DATED:  December 18, 2017                    /s/ Freda L. Wolfson
                                             Freda L. Wolfson
                                             U.S. District Judge